Filed 2/8/17 Unmodified opinion attached

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>WILLIAM DAVID BUSH,<br><br>    Defendant and Appellant. | A140589<br><br>(Sonoma County<br>Super. Ct. No. SCR636522)<br><br>ORDER MODIFYING OPINION AND<br>DENYING REHEARING<br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on January 11, 2017, be modified as follows:

1.  At the end of the first (split) paragraph on page 23, after the last sentence before the *Faretta* citation, add as footnote 17 the following footnote, which will require renumbering of all subsequent footnotes:

   [17] In his petition for rehearing, defendant argues this court should have examined whether the inadequate admonishment affected or contributed to the *guilty verdict* rather than to his decision to decline representation. But we have used the same formulation that our Supreme Court applied in *Burgener*, in the same context, although *Burgener* did so without deciding whether it was the proper test, because the error in the case before it was not harmless. (*Burgener, supra*, 46 Cal.4th at p. 245.) Other appellate courts have applied the same standard. (See, e.g., *Sullivan, supra*, 151 Cal.App.4th at p. 553; *Noriega, supra*, 59 Cal.App.4th at pp. 321-322; *People v. Wilder* (1995) 35 Cal.App.4th 489, 502; *People v. Fabricant* (1979) 91 Cal.App.3d 706, 713-714.) In any event, on the facts of this

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.B.

1

case, the two formulations are essentially the same. As discussed, defendant's adamant refusal to accept counsel—a personal choice, which must be respected, even if unwise (see *Faretta, supra*, 422 U.S. at p. 834)—demonstrates that the single omission in the admonishment would not have deterred him from representing himself and, consequently, would not have affected the verdict.

2. On page 41, in the first full paragraph after the second sentence, the language is modified to read as follows:

> Attempting to avoid this conclusion, defendant cites only the unsworn, out-of-court statements he made to the police that the money came from a legitimate ATM business. No other evidence was offered indicating such a business actually existed, however, and defendant does not dispute he also provided a contradictory explanation that his mother gave him the money. (See, e.g., *People v. Player* (1958) 161 Cal.App.2d 360, 362 ["Inconsistent statements relevant to the crime charged . . . . tend[] to show a consciousness of guilt"]; *People v. Carrillo* (1995) 37 Cal.App.4th 1662, 1669-1670 [evidence of false exculpatory statements "suggest that there is no honest explanation for incriminating circumstances"].) These unsworn, uncorroborated statements, which he later contradicted, could not have led a rational jury to believe the money in his car trunk came from a lawful ATM business. Even if the trial court erred in not instructing the jury on the elements of an unlawful sale of marijuana, therefore, it was harmless error.

There is no change in the judgment.

Appellant's petition for rehearing is denied.

Dated: _____ _____, P.J.

2

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

THE PEOPLE,

      Plaintiff and Respondent,

v.

WILLIAM DAVID BUSH,

      Defendant and Appellant.

A140589

(Sonoma County
Super. Ct. No. SCR636522)

Defendant William David Bush appeals a judgment entered upon a jury verdict finding him guilty of driving with a suspended license and of receiving and acquiring proceeds knowing them to be derived from a controlled substance offense with the intent to conceal those proceeds and avoid a transaction reporting requirement. He contends on appeal that he did not knowingly and intelligently waive his right to counsel; that there was insufficient evidence he intended to conceal the nature or source of the money; that he could not be convicted for receiving or acquiring proceeds from sales that he allegedly conducted himself; and that the jury should have been instructed on the elements of the underlying controlled substance offense. We shall affirm the judgment.

## I.  BACKGROUND

We limit our recitation of the facts to those necessary for resolution of the issues on appeal.

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.B.

1

On October 6, 2012, California Highway Patrol (CHP) Officer Nicole Brigstock stopped defendant for speeding in a black Mercedes sedan that was missing a front license plate. Officer Brigstock had been a CHP officer for more than 10 years at the time, had attended drug recognition training the year before, and in the course of her work had come in contact with marijuana specifically two or three times a week. She was therefore familiar with the distinctive smell of marijuana and recognized it as she walked up to defendant's vehicle after stopping him. The smell was intense and when she leaned her head in the passenger window, she could tell it was coming from the vehicle.

Officer Brigstock told defendant she could smell marijuana coming from his car and asked for his car keys, license, registration, and insurance. Defendant handed her an Arizona driver's license, explaining that he lived both in Arizona and with his parents in Santa Rosa and moved all the time. He said the marijuana smell probably was coming from him because he had been touching marijuana earlier that day. Officer Brigstock saw leafy particles that she recognized as marijuana on the center console and passenger side floor area of the car. She asked defendant to get out of the car and noted a "very intense" smell of marijuana on his person when he did so.

Officer Brigstock requested backup and then searched the vehicle. She found $5 bills in the side pockets and on the floorboard near the back seat, two cell phones in the center console, and a binder with papers. In the trunk, she found a big black suitcase and searched the contents. Among the clothing inside, stuffed in a pant leg, she found a plastic parcel. It was four feet long, heat sealed on all sides, and contained 10 individually sealed packs of money, mainly in smaller denominations, $1, $5, $10, and $20 bills. Defendant said the total amount was $100,000 and that it came from his automated teller machine (ATM) business, Mari Marc, in Puerto Vallarta. Officer Brigstock found business cards for Mari Marc but no other documents proving the money came from an ATM. Asked why he was not transporting the money in an armored truck, defendant said it was his life savings, and he wanted to keep it safe.

2

Officer Brigstock checked defendant's Arizona license and learned it was no longer good. She checked if he had a California driver's license and learned it had been suspended. Defendant said he had thought both licenses were good.

Although she found no marijuana, Officer Brigstock noted the car still smelled overwhelmingly of it, with all doors opened. She requested a canine unit, thinking marijuana might be hidden in the car's body. Taking another look at the papers on the front seat, she noticed a reminder on an August calendar, "Go to DMV and fix license." Questioned about it, defendant confessed he knew his California license was suspended but insisted he had thought his Arizona license was still good.

By this time, CHP Officer Brian Wood had arrived as backup. He had been a CHP officer for 10 years and had considerable experience with investigations involving raw unprocessed marijuana. He noticed "a strong odor of marijuana" coming from defendant's vehicle and saw small particles on the vehicle floor and carpeting that he recognized as marijuana.

Santa Rosa police officer and canine handler, Patrick Gillette, arrived next with his police dog, Utz, who is trained and experienced in detecting the odor of narcotics, including marijuana. Officer Gillette had 22 years of experience, including about six years working in narcotics investigations and had seen marijuana "thousands of times." As soon as he got out of his car, he noticed "the overwhelming smell of raw marijuana."

Officers Brigstock and Wood briefed Officer Gillette and then returned the suitcase with the money to the trunk of defendant's car, closing the trunk. Officer Gillette got Utz out of his car and brought him to the trunk, instructing him to search for drugs. Utz immediately became excited and signaled he had detected narcotics by scratching on the trunk. Allowed to search inside defendant's vehicle, Utz gave the same signal at the glove box and on the driver's seat. Standing just outside the car, Officer Gillette could smell marijuana also.

One of the officers then removed the money from the suitcase, placing it about 25 yards down a nearby driveway, upwind of defendant's car. Bringing Utz to the start of the driveway, Officer Gillette commanded him to search again and removed his leash.

3

Utz worked his way to the money and signaled that he detected narcotics. Officer Wood moved the money farther down the driveway, and Utz again worked his way to it and signaled he smelled narcotics on it. Utz had a documented accuracy rate of more than 97 percent in detecting narcotics.

At this point, concluding the money "was probably from selling controlled substances," Officer Brigstock called a narcotics taskforce to investigate. Narcotics detective Bryan Londo of Sonoma County Sheriff's Department responded. He had 17 years' experience as a peace officer and specialized narcotics training. Inspecting defendant's vehicle, he too noticed an odor of raw marijuana and saw particles inside that he recognized as marijuana.

Detective Londo then went through the papers on defendant's passenger seat. He found receipts for $1,900 in electronic money transfers, which he knew people use to purchase narcotics because it leaves no paper trail. He found a legal pad containing the notes "SD" with a number—for example SD 5 and SD 20—which he understood as a common drug sellers' shorthand for tracking sales of specified pounds of Sour Diesel, a particular marijuana strain. He found a shopping list for fertilizer, bloom enhancer, and other items that can be used to grow marijuana, and he found a cash receipt for about $4,000 spent on wood, part of a gate, and a privacy lattice, supplies the detective had seen used to conceal tall outside marijuana grows.

Detective Londo read defendant his *Miranda*[1] rights, and defendant agreed to answer questions. He repeated that the money came from his business of ATMs in Mexico and was his life savings, explaining that he liked to keep it safe in the trunk of his car. After Detective Londo finished questioning defendant, Officer Brigstock arrested him for driving while unlicensed.

When the money found in defendant's car later was counted, it totaled $46,959. In reviewing the papers taken from the car, Detective Londo found a $5,000 cashier's check from a Tristan Von Junsch made out to Tesla Motors and another $5,000 check to

---

[1] *Miranda v. Arizona* (1966) 384 U.S. 436.

4

defendant from a business called Web Tab.  A Web Tab representative later confirmed the check refunded cash that defendant had put on account for future purchases.

Detective Londo subpoenaed defendant's bank records for the past two years and found cash deposits totaling $113,000.  He saw several purchases from a hydroponics store, which sells equipment and supplies that can be used to grow marijuana.  A forensic download of the two cell phones found in defendant's car revealed that the text messages had been erased.

Interviewed again at the county sheriff's office, defendant first said his mother had given him the money found in his car and later said he earned it from his ATM business.  He presented documents in Spanish that Detective Londo could not read and said he dealt mainly in cash, which is hard to track.  He told Detective Londo he had not filed tax returns for at least two years.

Detective Londo searched the Internet for information on a business named Mari Marc and checked with the State Board of Equalization.  The latter had no permits or sales tax documentation for such a business, and the Internet search yielded a single website, possibly Swedish or German, apparently launched in 2007, containing no contact information.

During the investigation, Detective Londo observed defendant driving a new Jeep Cherokee and obtained the records of that purchase and of the Mercedes defendant had been driving. In both instances, the records reflected large cash deposits, $20,000 for the Mercedes and $10,000 for the Jeep.  Detective Londo observed that defendant's use of cash meant there was no record of the money's source.  Based on his investigation, he concluded defendant had acquired the money found in his car from marijuana sales.  Defendant did not testify at trial.

The jury found defendant guilty of the felony offense of knowingly receiving and acquiring proceeds knowing them to be derived from a controlled substance offense with the intent to conceal those proceeds and avoid a transaction reporting requirement

5

(Health & Saf. Code, § 11370.9, subd. (a)[2] (count one); and guilty of the misdemeanor offense of driving with a suspended license (Veh. Code, § 14601.1, subd. (a)) (count two).[3] The trial court imposed a suspended sentence, placing defendant on probation for three years, and ordered him to serve six months in jail and to pay a fine of $94,000.[4]

## II. DISCUSSION

### A. *Self-representation*

Defendant represented himself at trial and now contends his conviction must be reversed because his waiver of the right to counsel under *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*) was defective for lack of proper admonitions. We reject this contention.

#### 1. Background

The original felony complaint was filed in 2012. Defendant was represented by retained counsel early in the case.

##### a. *February 25, 2013—Faretta Hearing*

On February 25, 2013, defendant submitted a form requesting leave to represent himself.[5] He answered yes to all questions on that form, indicating he understood he had a right to representation by an attorney, including an appointed attorney if he could not

---

[2] All undesignated section references below are to the Health and Safety Code.

[3] Defendant's arguments on appeal do not address the merits of the conviction for the driving offense.

[4] Pursuant to the parties' stipulation, the court also ordered the forfeiture of the money seized in the search of defendant's vehicle.

[5] All further date references are to events that occurred in 2013.

6

pay, and that he understood the listed disadvantages of self-representation.[6]  At the hearing on his request, he told the court he had graduated high school, completed two years of junior college, and been involved as a litigant in multiple civil cases over the course of four and a half years.

The court explained to defendant that, even for experienced attorneys, "it is never a good idea to represent yourself, because you don't have the objectivity another professional would have on your behalf."  If it granted the request, the court cautioned, it could not "lean over backwards for [him] because that would be unfair to the People.  If there is something you don't know or understand . . . as far as making motions, subpoenaing witnesses, laying foundations to get certain evidence, I can't help you, do you understand that?"  When defendant remained firm in his request, the court granted it, allowing retained counsel to withdraw.

### b.  May 15—Readiness Hearing

At a readiness hearing on May 15, two days before the original trial date, after defendant explained his reasoning for rejecting a proposed plea agreement, the court returned to the subject, asking "Why didn't you hire an attorney so perhaps you could pursue some of these issues . . . ."  Defendant responded, "More money, you know, it was what they were going after in the first place.  And I understand[.]  I've been in the system[.]  [A]nd it started out at $5,000.  They want $5,000 and it was going to take a

---

[6] Specifically, he wrote yes next to each of the following statements:  "[Do you know that:]  1.  It is well known that it is almost always not wise to act as your own attorney?  [¶] 2.  You may do more harm than good for yourself?  [¶] 3.  You will get no special treatment from the Judge, and you will have to follow the same rules that a lawyer would have to follow?  [¶] 4.  The prosecuting lawyer against you will be an experienced lawyer, and it is this lawyer's duty to give you no special treatment or consideration?  [¶] 5.  If you had a lawyer of your own, that lawyer might file pretrial motions and conduct investigations before advising you what to do?  [¶] 6.  In acting as your own lawyer, you will not be able to receive the good advice of an experienced criminal lawyer?  [¶] 7.  No one will be appointed to assist you in your self-representation?"  He also answered "yes" to the question, "Do you understand that if the Judge allows you to represent yourself, you cannot later change the result by saying:  'I did not represent myself well,' or 'I should have had a lawyer?' "

year." "It went to 15, then 25," he continued, "and . . . I already have two firms of attorneys in Texas, I didn't do anything wrong here, there was nothing illegal, it is a situation where I feel like it could have been resolved between intelligent people. But they wanted my money like everybody does, and I felt like hiring more attorneys was going to be fighting fire with fire."

The court cautioned, "I just want to make sure it is on the record and you are properly advised that if you are convicted by a jury and ultimately sentenced to the maximum sentence, which I'm not saying you would be, it could be up to four years in state prison. That would be served locally in the county jail." "That could also include ultimately the forfeiture of the money" seized from defendant's vehicle, the court added.

In the same hearing, after defendant indicated he was unfamiliar with the Evidence Code and had not subpoenaed witnesses, the court again encouraged him to hire an attorney, saying, "All right, well you are facing a very serious charge. I'm strongly advising you against going forward with this trial without representation. If you can't afford an attorney[,] I can appoint one to represent you. There may be fees at the end of the trial. You certainly would be best served by having an attorney representing you. I know you've been very adamant about representing yourself. I believe you had represented to the Court that you do have an ability to pay an attorney, but basically choose not to. Those are choices that you have a Constitutional right to make. I hope I've highlighted some of the challenges you may face. I cannot ignore the laws. It is an adversarial process, so I can't favor you or help you just because you are unfamiliar with the process or the law. That would be unfair to the District Attorney's office. [¶] Do you have any interest in hiring your own attorney?" Defendant responded, "I have many attorneys in this case. . . . [Y]ou know, I hired two. And I have two more that called me to talk to me about it that are somewhat involved."

After further colloquy confirmed no attorney would be appearing to represent defendant, the court asked, "What can I do to dissuade you from going forward without a lawyer? I will emphasize, if you have no money . . . you have the right to the assistance of a public defender. I can appoint an attorney to represent you from right now until this

8

case is concluded. If there is an ability to pay, I may assign some fees at the end of the case, but essentially you have an absolute right to representation by a lawyer."

The discussion continued in the following colloquy: "THE DEFENDANT: Am I not intelligent enough to represent myself these days? Like I don't understand that. I mean we all have to like learn the system and the process. [¶] THE COURT: This is two days set from trial. If you can memorize and fully understand the Evidence Code between now and then. You are already too late to subpoena witnesses. Do you have any defense witnesses? [¶] THE DEFENDANT: Defense against what? [¶] THE COURT: Sir, you are facing a four-year felony here. Defense against that charge . . . . You are making— [¶] THE DEFENDANT: If God wants me to go to jail, I'll go to jail, that's fine." [¶] THE COURT: You are making very poor decisions. You may be extremely intelligent, but you don't seem to understand the Evidence Code or procedures for preparing a defense or what a defense even might be in this case. You mentioned a potential for an unlawful stop, yet you brought no motion properly to challenge that stop, either as a motion in limine or as a [Penal Code section] 1538.5 [motion to suppress]. You are not making good choices. [¶] THE DEFENDANT: I'm not defending the— [¶] THE COURT: Let me finish. Let me characterize it this way[.] [Y]ou don't know what you don't know. You may not be able to get any evidence before the jury if you don't follow rules. You don't have witnesses subpoenaed. You are subject to testifying yourself. You have to follow the Rules of Court as far as that testimony that's relevant and not wasteful of the court's time. So ultimately you may not have a defense at all. You . . . potentially stand to be convicted of a felony, which the People are willing to dismiss,[7] then have all of your property forfeited anyway and then ultimately do up to four years in prison served in a local jail. [¶] THE DEFENDANT: That would be a terrible terrible thing to do to somebody."

---

[7] The prosecutor and defendant told the court in this hearing that the prosecution had offered to drop the section 11370.9 charge if defendant would plead guilty to driving with a suspended license in violation of Vehicle Code section 14601 and stipulate to forfeiture of the $46,959 found in his car.

The hearing concluded shortly after this exchange. The case did not go to trial that month, however, because a prosecution witness was unavailable. As the prosecution was unable to meet the statutory deadline for bringing defendant to trial, and defendant refused to waive time, the court granted his motion to dismiss the case, without prejudice, knowing the prosecution would refile the charges.

   *c. June 10 and 20*

At a hearing on June 10 to discuss the prosecution's refiling of charges, the court began with the issue of self-representation, in the following colloquy: "THE COURT: . . . [I]t looks like the People are refiling their case. So my first question to [defendant] is have you reconsidered having an attorney? I can appoint an attorney to represent you . . . . [I]f you have no ability to pay[,] you are entitled to a defense. [¶] DEFENDANT BUSH: I'm speaking with [an attorney] out of Oakland, he's a civil rights attorney, he's thinking about taking this case pro bono, so he may be here . . . . [¶] THE COURT: . . . So you don't want me to appoint a public defender? [¶] DEFENDANT BUSH: No, Your Honor. [¶] THE COURT: And I know we've made extensive inquiries on the last case, but I do need to try once again to dissuade you from that. Again, you are entitled to a public defender to represent you through all proceedings. You can also [hire] someone else later or if someone wishes to substitute in pro bono that can occur later."

Discussing scheduling later in the same hearing, the court reiterated, "I strongly encourage [you] again to hire an attorney, have one appear on your behalf pro bono[,] or allow me to appoint someone to represent you [who] can help sort through these decisions. It is always helpful to have a lawyer provide you advice on the best procedure to follow." Defendant refused, telling the court, "I've had three or four attorneys in town call me consistently about this case since it started[.] I got advice. I can speak for myself, it just becomes a . . . trust issue."

At the start of a hearing on June 20, the court returned to the issue, in the following exchange: "THE COURT: Mr. Bush, you are still appearing without an attorney? [¶] [DEFENDANT] Yes. [¶] THE COURT: I know you are getting tired of

it[.]  I'm still willing to appoint an attorney to represent you.  You are entitled to representation, whether you can afford representation or not.  Certainly that is in your best interest.  Do you still wish to proceed on your own?  [¶] [DEFENDANT]:  They are expensive.  [¶] THE COURT:  No, but this is a public cost . . . .  The issue of whether you can afford one or not shouldn't come into consideration.  [¶] [DEFENDANT]:  My plan to go to law school when I came back from Mexico has turned into a real life experience, so I'm interested in learning . . . .  [¶] THE COURT:  You'll be matched up against someone who has gone to law school, who has been practicing for quite some time.  I can't favor one side or the other.  I would hate to get a preliminary law school education that is going to end up having you incarcerated for years.  [¶] [DEFENDANT]:  Fortunately the facts of the case are on my side and I'm not really in danger of that.  [¶] THE COURT:  So you still wish to proceed without the help of an attorney?  [¶] [DEFENDANT]:  Yes, Your Honor."

### d.  July, August, September

At each of the hearings on July 8 and 22, August 7 and 9, and September 6, 18, and 23, the court again asked defendant to hire an attorney or accept appointment of counsel at no cost if he was unable to pay, advising him that it would be in his best interest to do so.  Defendant declined each time, explaining alternatively that he wanted to speak for himself, he did not trust attorneys, he wanted to learn "the process," and the prosecution lacked evidence to win a conviction.

### 2.  Legal Principles

" 'A criminal defendant has a right under the Sixth Amendment to the federal Constitution, to conduct his own defense, provided that he knowingly and intelligently waives his Sixth Amendment right to the assistance of counsel.  (*Faretta, supra,* 422 U.S. at pp. 835-836); *People v. Bradford* (1997) 15 Cal.4th 1229, 1363.)  A defendant seeking to represent himself "should be made aware of the dangers and disadvantages of self representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'  [Citation.]"  (*Faretta, supra,* 422 U.S. at p. 835.)' "  (*People v. Burgener* (2009) 46 Cal.4th 231, 240-241 (*Burgener*).)

11

"Our own Supreme Court instructs that '[t]he test of a valid waiver of counsel is not whether specific warnings or advisements were given but whether the record as a whole demonstrates that the defendant understood the disadvantages of self representation, including the risks and complexities of the particular case.' " (*People v. Conners* (2008) 168 Cal.App.4th 443, 454 (*Conners*), quoting *People v. Bloom* (1989) 48 Cal.3d 1194, 1225; accord *People v. Lawley* (2002) 27 Cal.4th 102, 140.) " '[A]s long as the record as a whole shows that the defendant understood the dangers of self representation, no particular form of warning is required.' " (*Burgener, supra,* 46 Cal.4th at p. 241.) "On appeal, we review the entire record, including proceedings after the invocation of the right to self-representation, and determine de novo whether the defendant's waiver of the right to counsel was knowing and voluntary." (*Conners,* at p. 454, citing *People v. Marshall* (1997) 15 Cal.4th 1, 24; accord *People v. Jackio* (2015) 236 Cal.App.4th 445, 452 (*Jackio*).)

Defendant contends his waiver of his Sixth Amendment right to counsel was invalid because the trial court did not warn him of all the possible penal consequences if he was convicted of violating section 11370.9. There is no dispute that in addition to warning him at length about the tactical dangers and disadvantages of representing himself—e.g., because he would be opposing an experienced attorney, could receive no special treatment or assistance from the judge, and was making poor decisions that might ultimately compromise his ability to present a defense—the trial court also told him conviction could mean a sentence of up to four years' imprisonment and forfeiture of the $46,959 seized from his car. The court did not specifically inform him, however, that a monetary fine of up to $250,000 could be imposed.[8]

Defendant contends this omission alone precluded a valid waiver of his Sixth Amendment right to counsel, requiring reversal of his conviction. He relies primarily on *Iowa v. Tovar* (2004) 541 U.S. 77 (*Tovar*) and *Arrendondo v. Neven* (9th Cir. 2014)

---

[8] As noted, a fine of $94,000 ultimately was imposed.

763 F.3d 1122 (*Arrendondo*).[9]  Reviewing a decision of the Iowa Supreme Court, *Tovar* addressed a narrow question:  " 'Does the Sixth Amendment [of the United States Constitution] require a court to give a rigid and detailed admonishment to a *pro se* defendant pleading guilty of the usefulness of an attorney, that an attorney may provide an independent opinion whether it is wise to plead guilty and that without an attorney the defendant risks overlooking a defense?' " (*Tovar,* at p. 91.)  *Tovar* answered the question in the negative, concluding "neither warning is mandated by the Sixth Amendment." (*Id.* at p. 81.)  "The constitutional requirement is satisfied," *Tovar* observed, "when the trial court informs the accused of the nature of the charges against him, of his right to be counseled regarding his plea, and of the range of allowable punishments attendant upon the entry of a guilty plea." (*Ibid.*)

In *Arrendondo,* the defendant petitioned for a writ of habeas corpus, contending his pretrial waiver of counsel was invalid because the court had not explained the potential application of uncharged recidivist sentencing enhancements.  (*Arrendondo, supra,* 763 F.3d at p. 1133.)[10]  The Ninth Circuit Court of Appeals affirmed denial of the petition, concluding it was not an unreasonable application of United States Supreme Court case law to refuse to require, as the Nevada Supreme Court there had done, that a defendant understand the potential penal consequences of uncharged enhancements.  (*Id.* at pp. 1130-1131, 1134-1135.)  In analyzing the issue, *Arrendondo* characterized *Tovar, supra,* 541 U.S. 77 as establishing a "minimum" constitutional requirement that a defendant waiving counsel to enter a guilty plea "must understand 'the range of allowable punishments.' " (*Arrendondo,* at p. 1131 & fn. 2.)  Observing that the trial court there

---

[9] See, e.g., *Fair v. BNSF Railway Company* (2015) 238 Cal.App.4th 269, 287 [" '[T]he decisions of the lower federal courts on federal questions are merely persuasive' "].

[10] At the time of the defendant's conviction in *Arrendondo,* Nevada law allowed the prosecutor to seek an enhanced sentence by filing an information after conviction but before sentencing.  (*Arrendondo, supra,* 763 F.3d at p. 1133, fn. 4.)  In 2013, the Nevada legislature amended the law to require the filing of a habitual criminal information at least two days before the start of trial in most circumstances.  (*Ibid.*)

13

*had* informed the defendant of the maximum penalties for conviction of the charged offenses (*id.* at p. 1132), however, and applying the deferential standard of review required for habeas rulings, it concluded the state court reasonably might have decided "the *Tovar* right" did not apply. (*Id.* at p. 1135.)

In characterizing *Tovar* as establishing a constitutional "minimum"—a so-called "*Tovar* right"—*Arrendondo, supra,* 763 F.3d 1122 overstates the holding of that case. In *Tovar,* the Supreme Court expressly underscored the narrow nature of its ruling, stating, "We hold *only* that the two admonitions the Iowa Supreme Court ordered are not required by the Federal Constitution." (*Tovar, supra,* 541 U.S. at p. 94, italics added.) Although it affirmed that the constitutional requirement of a knowing, intelligent waiver "is satisfied when the trial court informs the accused of the nature of the charges against him, of his right to be counseled regarding his plea, and of the range of allowable punishments attendant upon the entry of a guilty plea" (*id.* at p. 81), the Supreme Court did *not* state that courts must give these advisements in every case.[11]

To the contrary, in *Tovar, supra,* 541 U.S. 77 the court reaffirmed its long-standing rule that there is no prescribed formula for ensuring a defendant knows what he is doing in electing to represent himself. "The information a defendant must possess in order to make an intelligent election . . . will depend on a range of case-specific factors, including the defendant's education or sophistication, the complex or easily grasped nature of the charge, and the stage of the proceedings." (*Id.* at p. 89.) Although "[w]arnings of the pitfalls of proceeding to trial without counsel . . . must be 'rigorous[ly]' conveyed," the court observed (*ibid.*), a waiver of counsel is " 'knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply *in general* in the circumstances—even though the defendant may not know the *specified detailed* consequences of invoking it.' [Citation.]"

---

[11] See *People v. Evans* (2008) 44 Cal.4th 590, 599 [" '[a]n appellate decision is not authority for everything said in the court's opinion but only "for the points actually involved and actually decided" ' "].

14

(*Id.* at p. 92.)  That a defendant " 'lacked a full and complete appreciation of all of the consequences flowing from his waiver,' " will not alone defeat a showing that " 'the information . . . provided to him satisfied the constitutional minimum.' "  (*Ibid.*)  "[T]he information a defendant must have to waive counsel intelligently will 'depend, in each case, upon the particular facts and circumstances surrounding that case.'  [Citation.]"  (*Ibid.*)

Based upon all of the language in *Tovar*, *supra,* 541 U.S. 77, we respectfully disagree with the Ninth Circuit's conclusion that *Tovar* "clearly establishes that a defendant waiving counsel must understand 'the range of allowable punishments . . . .' [Citation.]"  (*Arrendondo*, *supra*, 763 F.3d at p. 1131, fn. 2.)  In *Burgener,* our own Supreme Court interpreted *Tovar* as simply affirming the long-standing rule that the information a defendant must possess to make an intelligent waiver "depends on the particular facts and circumstances" of each case.  (*Burgener, supra,* 46 Cal.4th at p. 242.) What *Tovar* requires is that the defendant be "made aware 'of the hazards ahead' if he proceed[s] without the assistance of counsel."  (*Ibid.*)  In evaluating this point, *Burgener* reiterated, " ' "the test is whether the record as a whole demonstrates that the defendant understood the disadvantage of self-representation, including the risks and complexities of the particular case." ' "  (*Id.* at p. 241; see also *People v. Weber* (2013) 217 Cal.App.4th 1041, 1059 [citing *Tovar* for the proposition that "[a]*lthough no particular warnings are required,* 'before a defendant may be allowed to proceed pro se, he must be warned specifically of the hazards ahead' "], italics added.)

In *People v. Sullivan* (2007) 151 Cal.App.4th 524, this court applied the same test, re-affirming that no " ' " 'specific warnings or advisements' " ' " are required.  (*Id.* at p. 546.)  Like *Burgener, supra,* 46 Cal.App.4th 231, *Sullivan* cited *Tovar* in this context for the narrow proposition that the information a defendant must possess to waive counsel intelligently will vary in every case.  (*Sullivan*, at p. 546.)  We do not ignore that in exhaustively setting forth the applicable legal principles *Sullivan* did cite a Ninth Circuit Court of Appeals opinion for the principle that a trial judge, among other things, must ensure a defendant understands " 'the possible penalties,' " but *Sullivan* did not

15

discuss or apply this requirement. (*Id.* at p. 545.) Nor did the court rely on that principle for its conclusion. Rather, there, the trial court erred by entirely failing to advise defendant of his right to appointed counsel and failing to obtain an express waiver when defendant was arraigned on the felony information. (*Id.* at p. 551.)

*People v. Noriega* (1997) 59 Cal.App.4th 311, which defendant also cites, is similar. Although the Court of Appeal there faulted the trial court for not having inquired, among other things, whether the defendant "understood the charges against him and the potential penal consequences if he lost at trial" (*id.* at p. 319), it did not rule that a trial court in every instance must affirmatively warn a defendant on this point. Nor did it discuss the scope of the required inquiry in this area. (*Id.* at pp. 319-320.) Ultimately, the Court of Appeal ruled there had been prejudicial error requiring reversal of the conviction in that case because "the trial court did not give *any* necessary warnings to assure itself [the defendant] was making an informed and intelligent decision to represent himself despite the disadvantages and risks of that choice"; to the contrary, the court "seemed to encourage [the defendant] to take that course" with comments that "were likely to further mislead [him] about the true consequences of the waiver." (*Id.* at pp. 320-321, italics added).

More recently, another court reiterated, after acknowledging *Sullivan* and *People v. Noriega, supra*, 59 Cal.App.4th that "[t]he overriding principle . . . remains as stated in *People v. Bloom, supra,* 48 Cal.3d at page 1225: the test of a valid waiver of counsel is based on the record as a whole." (*Conners, supra,* 168 Cal.App.4th at p. 455; see also *People v. Marshall, supra,* 15 Cal.4th at p. 24 ["[e]ven when the trial court has failed to conduct a full and complete inquiry regarding a defendant's assertion of the right of self-representation, [appellate] courts examine the entire record" to determine whether the waiver of the right to counsel was knowing and voluntary].)

It is true that the Court of Appeal in *Jackio* read *Tovar* differently. It concluded that *Tovar* requires that a court, in admonishing a defendant desiring to represent himself in a guilty plea, include " 'the range of allowable punishments.' " (*Jackio, supra,* 236 Cal.App.4th at p. 454.) Observing that in the guilty plea setting "the crimes and

16

enhancements for which the defendant can be punished are known," the court concluded that the same cannot be said for a waiver in a pretrial setting. (*Ibid.*) This is because it is "impractical to try to predict the possible terms and enhancements that will eventually be available to the trial court at sentencing" since it cannot be known whether a jury will acquit or convict on any given charge or find true the enhancement allegations. (*Ibid.*) Therefore, *Jackio* concluded, it suffices to advise a defendant who is seeking to represent himself at trial of the maximum punishment that could be imposed if he is found guilty, rather than "the range of allowable punishments." (*Id.* at pp. 454-455.)

It appears that the parties in *Jackio* did not question whether the court had an affirmative obligation to warn the defendant about the maximum punishment, as it was undisputed in that case that he had been so warned. (*Jackio, supra,* 236 Cal.App.4th at pp. 451-452.) Instead, the dispute centered on the *adequacy* of the warning. The defendant contended it was not enough to tell him that he faced " 'life in prison,' " because this could mean "incarceration for the rest of his life" or an indeterminate life term with the possibility of parole after seven years. (*Id.* at pp. 455-456.) The court disagreed, concluding there was no duty to explain "that defendant was facing possible determinate and indeterminate [life] terms or that he could be subject to consecutive terms of 25 years to life." (*Id.* at p. 456.) Because the defendant was warned he could be sentenced to life in prison, the court presumably did not have occasion to consider critically the question of whether a warning about the maximum potential penalty is always required for a valid waiver of the right to representation at trial.

Our review of the relevant cases does not persuade us that a pretrial waiver of counsel cannot be valid if the court did not specifically advise the defendant of all possible penal consequences of the charged offenses, including all monetary fines. While the better practice would be to inform the accused, on the record, of the maximum sentence, including any maximum monetary fine that could be imposed on a conviction,

17

defendant does not cite, and we have not found, any case specifically concluding that an advisement on this point is a constitutional minimum in every case.[12]

As the California Supreme Court has observed, the purpose of recommended admonitions "is to ensure a clear record of a knowing and voluntary waiver of counsel, not to create a threshold of competency to waive counsel." (*People v. Koontz* (2002) 27 Cal.4th 1041, 1071.) No advisements can do more than impress upon the defendant the gravity of the matter and the likelihood that he cannot improve his position by foregoing professional representation. (See, e.g., *Lopez v. Thompson* (9th Cir. 2000) 202 F.3d 1110, 1119 ["In assessing waiver of counsel, the trial judge is required to focus on the defendant's understanding of the importance of counsel, not the defendant's understanding of the substantive law or the procedural details"]; *Faretta, supra,* 422 U.S. at p. 835 [the defendant "must 'knowingly and intelligently' forgo" "the traditional benefits associated with the right to counsel"].) Accordingly, here we will apply the test articulated in *Burgener*. As stated in that case, " ' "the test is whether the record as a whole demonstrates that the defendant understood the disadvantages of self-representation, including the risks and complexities of the particular case." [Citations.]' " (*Burgener*, *supra*, 46 Cal.4th at p. 241.) But even assuming, arguendo, that the trial court had an affirmative duty specifically to admonish defendant about the maximum potential fine on conviction, we also reject defendant's contention that the omission of this single piece of information from the court's extensive colloquy with him about the hazards and risks of self-representation requires an automatic reversal.

3. Structural Error and Harmless Error

" 'Error that occurs during the presentation of the case to the jury is generally trial error; an error that erroneously adds to or subtracts from the record before the jury can "be quantitatively assessed in the context of the other evidence presented in order to

---

[12] Although the Sixth Circuit Court of Appeals has deemed a trial court's failure to inform a defendant of a monetary fine "troubling," it did not hold that such an admonition is required. (*Akins v. Easterling* (6th Cir. 2011) 648 F.3d 380, 399.)

18

determine whether its admission was harmless beyond a reasonable doubt." [Citations.] A court in such circumstances can meaningfully ask "whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error." [Citation.] In contrast, structural errors not susceptible to harmless error analysis are those that go to the very construction of the trial mechanism—a biased judge, total absence of counsel, the failure of a jury to reach any verdict on an essential element.' [Citations.] . . . . [¶] In short, trial errors can be fairly examined in the context of the entire record and are amenable to harmless error review. Structural errors, on the other hand, go to the very reliability of a criminal trial as a vehicle for determining guilt or innocence and are reversible per se. [Citations.] A structural error requires per se reversal because it cannot be fairly determined how a trial would have been resolved if the grave error had not occurred. For example, it would be impossible to divine how a trial would have proceeded if a defendant had been allowed counsel or the trial judge not been biased." (*People v. Anzalone* (2013) 56 Cal.4th 545, 553-554.)

The United States Supreme Court "has 'repeatedly recognized that the commission of a constitutional error at trial alone does not entitle a defendant to automatic reversal.' [Citation.] An error is . . . 'subject to automatic reversal, only in a "very limited class of cases." ' " (*People v. Mil* (2012) 53 Cal.4th 400, 410.) It is required, for example, where a court denies an indigent defendant's request for appointment of counsel, as occurred in *Gideon v. Wainwright* (1963) 372 U.S. 335, 336 (see *Neder v. United States* (1999) 527 U.S. 1, 8 (*Neder*)), or, as defendant notes, where an accused is denied the right to counsel of his choice because the attorney is erroneously disqualified. (*United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, 144.)

Although the denial of a proper request for self-representation has been determined to be structural error (*McKaskle v. Wiggins* (1984) 465 U.S. 168, 177, fn. 8), neither the federal Supreme Court nor the state Supreme Court has decided whether the granting of a request for self-representation based on an inadequate *Faretta* admonishment compels the same result. (See, e.g., *McCormick v. Adams* (9th Cir. 2010) 621 F.3d 970, 979; *Burgener, supra,* 46 Cal.4th at pp. 243-244.) Our state courts that

have addressed the question have applied the *Chapman* harmless error standard.[13]  (See cases collected in *People v. Sohrab* (1997) 59 Cal.App.4th 89, 99-100, disapproved on other grounds in *People v. Crayton* (2002) 28 Cal.4th 346, 366, fn. 10.)[14]  Although two California courts have applied automatic reversal following errors in allowing self-representation, the cases are readily distinguishable.  In both instances the defendants received *no* self-representation warnings at all before being allowed to proceed without counsel.  (*People v. Hall* (1990) 218 Cal.App.3d 1102, 1108-1109; *People v. Lopez* (1977) 71 Cal.App.3d 568, 570-571.)[15]

Defendant contends a *Faretta* error involves "choice of counsel," which is necessarily unquantifiable, and therefore unquestionably qualifies as structural error, citing *United States v. Gonzalez-Lopez, supra,* 548 U.S. at p. 149 (both denial of counsel and denial of right of self-representation are structural errors).  Defendant then points to three California cases holding that "*Faretta* error" is reversible per se:  *People v. Boyce* (2014) 59 Cal.4th 672, 702; *People v. Butler* (2009) 47 Cal.4th 814, 824; and *People v. Joseph* (1983) 34 Cal.3d 936, 946.  These cases, however, all involve *denials* of *Faretta* motions that should have been granted.  In such cases, structural error applies for a reason that differs from the basis for other structural error.  As we have stated, in other cases— such as denial of counsel or judicial bias—the error is prejudicial per se because it cannot be known whether the matter would have had a better outcome if the defendant had been allowed counsel or the trial judge not been biased.  (*People v. Anzalone, supra,*

---

[13] *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) ("a federal constitutional error can be held harmless" "beyond a reasonable doubt").

[14] The Ninth Circuit apparently agrees.  (See *McCormick, supra*, 621 F.3d at p. 979 [a court's "defective . . . colloquy" with a defendant about a *Faretta* request " 'will not necessitate automatic reversal when the record as a whole reveals a knowing and intelligent waiver' "].)

[15] Other courts have avoided the debate, finding under the facts before them that the failure to advise of the dangers of self-representation is prejudicial even under a harmless error analysis.  (*Burgener, supra,* 46 Cal.4th at p. 245; *People v. Bauer* (2012) 212 Cal.App.4th 150, 161; *People v. Spencer* (1984) 153 Cal.App.3d 931, 945-946; *People v. Fabricant* (1979) 91 Cal.App.3d 706, 713-714.)

20

56 Cal.4th at p. 554.)  But where a request for self-representation has been erroneously *denied*, structural error applies for a different reason:  " 'Since the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amenable to "harmless error" analysis.  The right is either respected or denied; its deprivation cannot be harmless.' [Citation.]"  (*People v. Tena* (2007) 156 Cal.App.4th 598, 614.)

It seems to us that if an erroneous *denial* of a self-representation request—where the issue of defendant's knowledge or understanding is a close question—is reversible per se, *and* if the erroneous *granting* of such a request—where the admonition is incomplete rather than completely absent—is also reversible per se, the trial court is left with the narrowest of channels along which to navigate the shoals of possible error.  (See, e.g., *People v. Cervantes* (1978) 87 Cal.App.3d 281, 287 (*Cervantes*) [In this context, courts must navigate "between the Scylla of denying a defendant the right to determine his own fate and the Charybdis of violating his right to counsel by acceptance of an ineffectual waiver"], disapproved on another ground in *People v. Barnum* (2003) 29 Cal.4th 1210, 1219, fn. 1, 1222-1225.)  And, although the granting of a *Faretta* motion based on incomplete warnings can arguably be considered prejudicial per se because it results in an unknowing waiver of counsel (and thus a "denial" of counsel), we observe, as did the concurring opinion in *United States v. Salemo* (3d Cir. 1995) 61 F.3d 214, that "[s]uch a blanket rule could produce some strange results.  For example, suppose that a defendant does not validly waive counsel at sentencing but is given the mandatory minimum sentence prescribed by statute . . . .  In this case, must the sentence to be vacated and the case remanded so that the very same sentence can be imposed with counsel present?"  (*Id.* at p. 223, fn. 1.)

Based upon all of these considerations, we find *Cervantes* to be persuasive.  There the Court of Appeal rejected the defendant's contention "that failure of the trial court to adequately warn [him] of the hazards and risks of self-representation require[d] an automatic reversal," concluding that the *Chapman* test applied in such circumstances instead.  (*Cervantes*, *supra*, 87 Cal.App.3d at p. 291.)  The court reasoned, "We perceive

21

a signal difference between a case where an indigent was not advised at the time of trial on the merits that he could have an attorney appointed by the court at public expense and did not waive his right to counsel as in *In re Smiley* (1967) 66 Cal.2d 606, which requires a reversal per se, and one where defendant, as in the instant case, was fully aware of his right to counsel, requested to represent himself pursuant to *Faretta* and in fact was granted self-representation but which was predicated on an insufficient record with respect to a warning of the pitfalls involved in self-representation as mentioned in *Faretta.*" (*Cervantes,* at p. 292.)[16]

Although a defendant who "unequivocally requested permission to conduct his own defense pursuant to *Faretta* should not be precluded on the theory of 'invited error' or 'estoppel' from raising on appeal the issue of the trial court's failure to adequately warn him of the dangers entailed in self-representation," the court reasoned, "some standard of review short of an automatic reversal should be applied." (*Cervantes, supra,* 87 Cal.App.3d at p. 293.) We concur in the court's holding that the *Chapman* standard is appropriate. Applying that standard, we conclude that, if there was demonstrable error, such error here was harmless.

### 4. Knowing and Intelligent Waiver

The first question posed is whether the warnings provided by the trial court satisfied the constitutional requirement that defendant be made aware of the disadvantages of self-representation, including the risks and complexities of defendant's specific case. (*Burgener, supra*, 46 Cal.4th at p. 245.) The record as a whole convinces us the trial court satisfied that requirement and did not err in failing to inform defendant during the *Faretta* colloquies of the maximum fine on conviction. But, even if such was error, the record as a whole also convinces us beyond a reasonable doubt that defendant

---

[16] In *Cervantes*, the defendant had been represented by a public defender before requesting self-representation. (*Cervantes, supra,* 87 Cal.App.3d at pp. 286, fn. 1, 294.) After confirming that he knew the charges against him and had completed two years of college, the trial court warned "he would be afforded no 'special privileges and [would] be treated the same as if [he] had counsel." (*Ibid.*)

22

knew what he was doing in requesting self-representation, made his choice with eyes open, and would have done the same even if the court had advised him specifically about the maximum potential fine on conviction. (*Faretta, supra,* 422 U.S. at p. 835.)

When defendant first requested leave to represent himself, he completed a form affirming that he understood the numerous dangers and disadvantages of doing so. The court attempted to talk him out of discharging his attorney in that instance and returned to the subject in each of 10 subsequent hearings, each time offering to appoint an attorney to represent defendant if he could not afford to retain one himself. In one hearing, the court twice advised defendant that a conviction could mean up to four years of incarceration and forfeiture of the $46,959 seized from his car. In another, it observed that he could be "incarcerated for years."

As the case progressed, the court strongly cautioned defendant that he was "making very poor decisions." It noted he did not "seem to understand the Evidence Code," which created "almost an impossible hurdle of getting any . . . evidence into court," and also that he did not seem to understand the "procedures for preparing a defense or what a defense even might be in this case." Observing that he had brought no motion in limine or motion to suppress, although his comments suggested such actions might be appropriate, the court told the defendant, "[Y]ou don't know what you don't know. You may not be able to get any evidence before the jury if you don't follow rules. You don't have witnesses subpoenaed . . . . So ultimately you may not have a defense at all. You . . . potentially stand to be convicted of a felony, which the People are willing to dismiss, then have all of your property forfeited anyway, and then ultimately do up to four years in prison."

The record also shows that defendant was a high school graduate who had completed two years of junior college, had experience as a civil litigant, and claimed to own several businesses through which he had earned "probably $3.8 million" in the "past six years." He does not claim on appeal that he did not understand the court's warnings or the risks in question. In response to the court's repeated warnings, he remained

23

adamant, responding that he had already consulted attorneys and was continuing to consult attorneys during the case.

The record reflects that defendant retained one attorney and then substituted in a second during the first four months of the proceedings. In his initial appearance with each, he was provided a copy of the criminal complaint, which cited Health and Safety Code section 11370.9 as the basis for one of the two charged offenses. A simple reading of the statute reveals the potential of a $250,000 fine. (Health & Saf. Code, § 11370.9, subd. (e).) As noted, during settlement discussions, the prosecution told defendant it would drop the section 11370.9 charge if he would plead guilty to driving with a suspended license in violation of Vehicle Code section 14601 and stipulate to forfeiture of the $46,959 found in his car.

Defendant repeatedly insisted that the prosecution had no case, the facts were in his favor, he was intelligent enough to represent himself, and he wanted to speak directly to the jury. Over the course of several months, despite the court's repeated reminders at 10 separate hearings that he had an absolute right to representation by counsel and the court's repeated offer at each of those hearings to appoint a public defender to represent him at little or no cost to himself, defendant declined. The record abundantly shows defendant wanted to waive counsel, understood the essential risks, chose to do so, and would have chosen the same had the trial court specifically advised him about the maximum potential fine on conviction.[17]

### B. Sufficiency of the Evidence

Defendant next contends there is insufficient evidence to support his conviction under section 11370.9, subdivision (a). We disagree.

When reviewing a challenge to the sufficiency of the evidence, we ask " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier

---

[17] We do not address the question the parties raise about which side bears the burden of proof on a challenge to the validity of a Sixth Amendment waiver of counsel because we find that the record establishes a knowing and intelligent waiver regardless of where that burden lies.

24

of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Edwards* (2013) 57 Cal.4th 658, 715, quoting *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) "In doing so, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence' " (*Edwards*, at p. 715) and " ' "must accept logical inferences that the [jury] might have drawn from the circumstantial evidence." [Citation.]' " (*People v. Dealba* (2015) 242 Cal.App.4th 1142, 1149). "Because the sufficiency of the evidence is ultimately a legal question, we must examine the record independently for ' "substantial evidence." ' " (*People v. Banks* (2015) 61 Cal.4th 788, 804, quoting *People v. Boyce, supra,* 59 Cal.4th at p. 691.)

Section 11370.9, subdivision (a) provides in pertinent part: "It is unlawful for any person knowingly to receive or acquire proceeds . . . known to be derived from any violation of [the California Uniform Controlled Substances Act (Health & Saf. Code, § 11000 et seq.) (Controlled Substances Act)] with the intent to conceal or disguise . . . the nature, location, ownership, control, or source of the proceeds or to avoid a transaction reporting requirement under state or federal law." The word "proceeds," as used in this section, means "property acquired or derived directly or indirectly from, produced through, or realized through any violation of [the Controlled Substances Act]." (*Id.,* § 11370.9, subd. (h)(1).) Other statutes define "property" as including money. (See, e.g., Pen. Code, § 7; Code Civ. Proc., § 17.)

In challenging the sufficiency of the evidence supporting his conviction under section 11370.9, subdivision (a), defendant does not dispute that he concealed money in the trunk of his car or that the money was connected to marijuana sales. Instead, he focuses on the element of intent, arguing it was not enough to show that he concealed the money found in his car, but that there must be evidence he intended to conceal an attribute of the money, for example, its nature or source, i.e., that it came from an unlawful drug transaction. In his opening brief, defendant cursorily contends, without citation to the record, that the court did not instruct the jury about this element of intent, and there was insufficient evidence he had such intent. We disagree on both points.

25

As an initial matter, the record reflects that the court did instruct the jury regarding that charge and, specifically, the element of intent. It told the jury: "To prove that the defendant is guilty of [violating section 11370.9], the People must prove that [he], one, knowingly received or acquired proceeds or engaged in a transaction including proceeds in excess of $25,000.[18] Two, knew the cash was derived from any violation of [the Controlled Substances Act]. And, three, had *the intent to conceal, disguise or aid in concealing or disguising the nature, location, ownership, control or source of the proceeds or to avoid a transaction reporting requirement under state or federal law*." (Italics added.) The court also instructed the jury that this charge "requires specific intent. For you to find a person guilty of this crime, that person must not only intentionally commit the prohibited act but [also] must do so with the specific intent."

The prosecution covered the same point in its closing argument, telling the jury, "The second charge . . . is the money laundering. It is . . . section 11370.9. The defendant knowingly received or acquired proceeds or engaged in a transaction involving proceeds in excess of $25,000. He knew the cash was derived from any violation of the [Controlled Substances Act]. *He had the intent to disguise or aid in concealing or disguising the nature, location, ownership*[,] *control*[] *or source of proceeds, or to avoid a transaction reporting requirement under state and federal law*." (Italics added.) Later the prosecution explained, "The intent to disguise or aid in concealing or disguising the nature, ownership, location or control or the source of the proceeds. *Was he trying to conceal where he got those proceeds from*[?]" (Italics added.) Discussing the evidence that defendant had unexplained sources of cash and admitted not having filed income tax returns for two years, the prosecution also said, "And you can ask yourself as [to] someone who is accumulating all these funds who hasn't been paying his taxes, is he trying to avoid detection and avoiding taxes[?]"

---

[18] See section 11370.9, subdivision (f) ["This section shall apply only to a transaction, or series of related transactions within a 30-day period, involving over twenty-five thousand dollars ($25,000) . . . ."].

26

We also disagree with defendant's contention that there was insufficient evidence he intended to conceal the nature or source of the money, i.e., that it was derived from unlawful marijuana sales. In his opening papers, defendant presented only a brief argument on this point, relying largely on *Cuellar v. United States* (2008) 553 U.S. 550 (*Cuellar*) for the proposition that hiding money while transporting it does not alone suffice to establish the requisite intent. Defendant did not actually discuss the evidence in his opening brief, nor did he fully explain his legal argument until his reply brief. In it, he argued for the first time that the record contained no evidence that he intended when he received the money to conceal its nature (drug money) or its source (unlawful drug sales). "As a general proposition, points raised for the first time in a reply brief will not be considered unless good reason is shown for failure to present them earlier." (*People v. Whitney* (2005) 129 Cal.App.4th 1287, 1298.) Despite defendant's failure to fully develop his argument in his opening brief, we will address the merits.

We begin with *Cuellar.* Although the case involved an analogous federal money-laundering statute, the proposition for which defendant cites it relied on statutory language not included in section 11370.9. *Cuellar* involved an alleged violation of 18 U.S.C. § 1956(a)(2)(B)(i) which, among other things, makes it a crime to "transport" money from unlawful drug sales out of the country knowing the transportation itself is designed to conceal the nature, location, source, ownership, or control of the money. (*Cuellar, supra,* 553 U.S. at p. 557 & fn. 2, quoting 18 U.S.C. § 1956(a)(2)(B)(i).)[19] The defendant in *Cuellar* was arrested driving toward the border between the United States

---

[19] See 18 U.S.C. § 1956(a)(2) ["Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—[¶] . . . . [¶] (B) knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part—[¶] (i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . [¶] . . . . [¶] shall be sentenced to a fine . . . or imprisonment"].

27

and Mexico with $81,000 in cash, bundled in plastic bags, concealed in a secret compartment in his car. (*Cuellar,* at p. 554.) While acknowledging that "secretively transporting" the money suggested that the defendant wanted to conceal the money, the court concluded that this fact alone did not establish that the defendant engaged in the predicate act, transporting the money, with the purpose of concealing one of the money's attributes (e.g., its source (unlawful drug sales)). (*Id.* at pp. 565-566.) In fact, to the contrary, the court observed, the only evidence offered about the purpose of the act (transporting the money) indicated the goal was to move the money back to Mexico to compensate leaders of the smuggling operation. (*Id.* at pp. 566-567.)

Under section 11370.9, subdivision (a), in contrast, the concealment prong required proof that defendant performed a different predicate act, *receiving* the money, with the intent to conceal one of the money's attributes. While, as *Cuellar* indicated, the manner in which money is transported may be weak evidence of the purpose of the transportation (*Cuellar, supra,* 553 U.S. at p. 566), it may be stronger circumstantial evidence of the intent with which it was received. An ordinary person might reasonably hide a large sum of money from public view to avoid theft, possibly going so far as to stuff the money up a pant leg in a suitcase in a car trunk while transporting it, but this innocent purpose would not necessitate also separating the money into 10 individually sealed packs and enclosing them in a heat-sealed plastic parcel.

Defendant maintains the manner in which the money was hidden says nothing about the circumstances or intent when it was acquired. We disagree. " ' "[T]he element of intent is rarely susceptible of direct proof and must usually be inferred from all the facts and circumstances disclosed by the evidence." [Citations.]' " (*People v. Lopez* (2015) 240 Cal.App.4th 436, 454.) A jury may find a defendant's intent in undertaking a particular action from his conduct after the action. (*People v. Edwards, supra,* 57 Cal.4th at p. 719.) In this case, four law enforcement officers from three different agencies testified that defendant's car smelled strongly of marijuana when he was stopped. One officer saw $5 bills lying in various locations inside the car, and three officers saw small particles they recognized as marijuana . Based on this evidence, a rational jury could

28

have concluded defendant wrapped the money himself while in his car after unlawfully selling marijuana.

Detective Londo provided expert testimony, and numerous federal courts have observed, that wrapping and sealing money in materials similar to those used to store the money found in defendant's car is a technique commonly employed to conceal the smell of drugs and avoid detection by drug dogs. (See, e.g., *United States v. $42,500.00 U.S. Currency* (9th Cir. 2002) 283 F.3d 977, 982 ["Unlike a purse or money pouch, cellophane is not a normal repository for carrying large amounts of money"]; *United States v. Burkley* (10th Cir. 2008) 513 F.3d 1183, 1189 [vacuum-sealed bags]; *United States v. $84,615 U.S. Currency* (8th Cir. 2004) 379 F.3d 496, 501-502 [same]; *United States v. $242,484.00 U.S. Currency* (11th Cir. 2004) 389 F.3d 1149, 1162 [cellophane-type material]; see also, e.g., *People v. Miranda* (2008) 161 Cal.App.4th 98, 104 [equating plastic and cellophane]; Merriam-Webster Dict. (Jan. 11, 2017) ) http://www.merriam-webster.com/cellophane [defining cellophane as "thin transparent sheets used especially for packaging].) "[W]here the consequences of an action are commonly known, a trier of fact will often infer that the person taking the action knew what the consequences would be and acted with the purpose of bringing them about." (*Cuellar, supra,* 553 U.S. at p. 567 & fn. 8.) Here a rational jury could have concluded defendant wrapped the money with the intent to conceal the smell of marijuana and, by extension, avoid detection by drug dogs, concealing the nature and source of the money as derived from unlawful marijuana sales.

Even if this were not the case, there was sufficient evidence to support the verdict on the alternative ground that defendant knowingly received money he knew derived from any unlawful marijuana sales "with the *intent . . . to avoid a transaction reporting requirement under state or federal law*." (Health & Saf. Code, § 11370.9, subd. (a), italics added.) Defendant did not dispute the sufficiency of the evidence on this point in his opening brief, although he belatedly attempted to do so in his reply. "It is axiomatic that arguments made for the first time in a reply brief will not be entertained because of

the unfairness to the other party." (*People v. Tully* (2012) 54 Cal.4th 952, 1075.) Even if this were not the case, however, we conclude there was sufficient evidence.

Defendant undisputedly received and spent large sums of cash. When he was stopped in his car, he had receipts for electronic money transfers totaling $1,900, receipts for other large cash purchases, a cashier's check for $5,000, and $46,959 in cash. He had made a deposit of $20,000 in cash for the Mercedes he was driving and he made another deposit of $10,000 in cash for a new Jeep shortly after the police stopped him. Detective Londo testified as an expert that electronic money transfers often are used in the drug trade to avoid creating a record or paper trail of sales transactions and that cash purchases achieve the same effect. Although defendant told the police he owned an ATM business, and records indicated he made other cash deposits to his bank account over the preceding two years totaling $113,000, he told police officers he had not filed tax returns in the same period and the police could find no evidence he owned a legitimate business. The prosecution argued at trial that defendant received money—including that found in his car—intending to avoid reporting and paying taxes on the income. A rational jury could have inferred from all the evidence that defendant purposely used cash, electronic money transfers, and cashier's checks to avoid creating a paper trail that would require him to report and pay taxes on income derived from unlawful marijuana sales, including the money found in his car. (See, e.g., *Spies v. United States* (1943) 317 U.S. 492, 499-500 [extensive use of cash may be considered evidence of intent to avoid proper reporting of taxable income]; *United States v. Stierhoff* (1st Cir. 2008) 549 F.3d 19, 26-27 [regularly conducting business in cash, using untraceable money orders, and earning substantial income over multiple years without reporting it may be evidence of intent to evade taxes].)

C.     *Health and Safety Code section 11370.9, subdivision (a)*

Defendant next takes issue with the prosecution's theory of the case, for the first time on appeal contending he may not be convicted of money laundering under section 11370.9 if the claim is that he acquired the money in question by unlawfully selling the marijuana himself. Relying almost entirely on *United States v. Santos* (2008)

553 U.S. 507 (*Santos*), which interpreted a federal money-laundering statute, he makes a cursory argument that the California Legislature cannot have intended section 11370.9 to criminalize conduct it had duly considered and appropriately punished in another law.  A person who acquires money directly from buyers through unlawful drug sales, he suggests, can only be charged, if at all, with violation of the law prohibiting the sale and not with any subsequent action to conceal the proceeds.

Although "we may consider a new theory presented for the first time on appeal if it presents a question of law arising from undisputed facts" (*People v. Smith* (2014) 227 Cal.App.4th 717, 727, citing *People v. Butler* (1980) 105 Cal.App.3d 585, 588), we are not persuaded by this argument.  As an initial matter, we note " '[i]t is axiomatic the Legislature may criminalize the same conduct in different ways.' " (*People v. Chenze* (2002) 97 Cal.App.4th 521, 528, quoting *People v. Superior Court (Caswell)* (1986) 46 Cal.3d 381, 395.)  In *People v. Benavides* (2005) 35 Cal.4th 69, for example, the court observed that the same conduct may be charged alternatively as lewd conduct, rape, or sodomy.  (*Id.* at p. 97; see also *id.* at p. 99 ["the rape or sodomy and lewd conduct, while based upon the same conduct, were not the same crime[]"]; see also, e.g., *People v. Vargas* (2014) 59 Cal.4th 635, 645 [a defendant may be charged with robbery and carjacking based on the same act, forcibly taking a victim's car]; Pen. Code, § 215, subd. (c) [authorizing same].)  " '[W]hen an act violates more than one criminal statute, the Government may prosecute under either so long as it does not discriminate against any class of defendants.' " (*People v. Villegas* (2001) 92 Cal.App.4th 1217, 1229, quoting *United States v. Batchelder* (1979) 442 U.S. 114, 123-124 (*Batchelder*).)

Although analysis of any claim regarding legislative intent must "begin with the plain language of the statute" (*People v. Watson* (2007) 42 Cal.4th 822, 828 [the statutory language "generally is the most reliable indicator of legislative intent"]), defendant does not discuss or acknowledge the expansive language of section 11370.9, subdivision (a). Without limitation, the provision expressly applies to "*any person* [who] knowingly . . . receive[s] or acquire[s] proceeds . . . known to be derived from any violation of [the Controlled Substances Act] with the intent to conceal" a specified attribute of the

31

proceeds or "to avoid a transaction reporting requirement." (Health & Saf. Code, § 11370.9, subd. (a), italics added.) The provision does not contain any language limiting its application to those who were not directly involved in a violation of the Controlled Substances Act. As it is our job " 'to ascertain and declare what is in terms or in substance contained in the provision, not to insert what has been omitted' " (*People v. Roach* (2016) 247 Cal.App.4th 178, 183, citing Code Civ. Proc., § 1858), we cannot add an exception that was not included. (See, e.g., *Blakely v. Superior Court* (2010) 182 Cal.App.4th 1445, 1454 [The Legislature knows how to create a statutory exception when it wants one].)

Defendant's argument regarding legislative intent is further undercut by the definition of "proceeds" found in subdivision (h)(1) of the same statute. As previously noted, it defines "proceeds" as "property acquired or derived *directly or indirectly* from, produced through, or realized through any violation of [the Controlled Substances Act]." (Health & Saf. Code, § 11370.9, subd. (h)(1), italics added.) The definition itself specifically includes money directly acquired through a violation of the act. This supports the conclusion that the Legislature intended that a person who commits the offense of an unlawful marijuana sale may be charged with violating section 11370.9, subdivision (a) if there is evidence of the requisite intent. Defendant's arguments to the contrary in his reply brief based on authority construing a different federal law are unpersuasive.

*Santos* does not require otherwise. Unlike here, the defendant in that case had been charged and convicted of both money laundering and the predicate offense, running an illegal lottery. (*Santos, supra,* 553 U.S. at pp. 509-510.) The federal money-laundering statute made it a crime to use "proceeds" from an unlawful activity in transactions intended to promote specified criminal pursuits. (*Id.* at pp. 510-511, quoting 18 U.S.C. § 1956(a)(1)(A)(i).) The defendant sought postconviction relief, contending there was no evidence of money laundering, applying a narrow interpretation to the word "proceeds." (*Santos*, at p. 510.) He maintained Congress must have intended the word to refer to profits obtained from an unlawful activity, not the gross receipts. (*Ibid.*)

32

Applying the rule of lenity and adopting an interpretation favoring the defense, a majority of the court agreed, where the predicate offense involved a gambling operation, affirming an order vacating the conviction (*Santos, supra,* 553 U.S. at pp. 510, 519 (plur. opn. of Scalia, J.); *id.*, at p. 528 (conc. opn. of Stevens, J.)), although Justice Stevens, writing separately, concluded "proceeds" could mean either profits or receipts depending on the predicate offense. (*Id.* at pp. 524-528 (conc. opn. of Stevens, J.).) In reaching its decision, the plurality reasoned in part that the alternative interpretation—construing "proceeds" as receipts—meant "nearly every violation of the illegal-lottery statute would also be a violation of the money-laundering statute, because paying a winning bettor is a transaction involving receipts that the defendant intends to promote the carrying on of the [illegal] lottery." (*Santos,* at pp. 515-516.) In other contexts, however, the court has determined Congress purposely intended to enact overlapping statutes, allowing prosecutors discretion in selecting which to charge. (*Batchelder, supra,* 442 U.S. at pp. 119-121 [The statutory language, structure, and legislative history reflect that "Congress intended to enact two independent gun control statutes" prohibiting convicted felons from receiving firearms].)

Significantly, in *Santos* the court looked beyond the statutory language to consider the consequences of the alternative interpretations only after determining the word "proceeds" was "truly ambiguous." (*Santos, supra,* 553 U.S. at pp. 511-512; see *id.* at p. 519 ["We interpret *ambiguous* criminal statutes in favor of defendants"] italics added.) In other instances, however, where " 'Congress has conveyed its purpose clearly," the court has " 'decline[d] to manufacture ambiguity where none exists.' " (*Batchelder, supra,* 442 U.S. at p. 122 [Where the defendant "unquestionably" violated a law allowing five years' imprisonment, the fact that another statute permits a term of no more than two years for the same conduct "is no justification for taking liberties with unequivocal statutory language"].) Section 11370.9, subdivision (a) unequivocally applies to "any person" who acquires money, "directly or indirectly," from a violation of the Controlled Substances Act, with intent to conceal or avoid a transaction reporting requirement. There is no ambiguity in the statute's plain language.

33

The reasoning in *Santos* also does not apply because, in determining legislative intent, it relied in part on the significant difference between the maximum punishment for money laundering and the maximum punishment for operating an illegal lottery under federal law. As the court observed, a defendant convicted under the former could be incarcerated for up to 20 years, while under the latter the maximum sentence would be just five years. (*Santos, supra,* 553 U.S. at p. 516, citing 18 U.S.C. §§ 1955(a), 1956(a)(1).) The court questioned whether Congress would have wanted to "radically increase" the sentence for the predicate offense in this manner. (*Santos*, at pp. 517 (plur. opn. of Scalia, J.); *id.* at p. 526 (conc. opn. of Stevens, J).) In contrast, the maximum sentence for a violation of section 11370.9, subdivision (a) is four years, while the maximum sentence for an unlawful sale of marijuana is three years. (Health & Saf. Code, §§ 11359-11360; Pen. Code, § 1170, subd. (h).)

For the foregoing reasons, we reject defendant's argument that his conviction under section 11370.9, subdivision (a) should be reversed because the Legislature did not intend the provision to apply to a person who acquired proceeds directly by unlawfully selling marijuana.

### D.    *Jury Instructions*

Defendant offers a final argument that his conviction under section 11370.9, subdivision (a) must be reversed because the trial court prejudicially erred in failing to adequately instruct the jury on all elements of the offense. The court did instruct the jury on the elements from that provision, explaining that conviction under section 11370.9 required proof defendant (1) "knowingly received or acquired proceeds," (2) "knew the cash was derived from any violation of California's Uniform Controlled Substances Act," and (3) "had the intent to conceal" specified attributes of the money or avoid a transaction reporting requirement. It also instructed that possession for sale of marijuana was an example of a violation of the Controlled Substances Act. Defendant contends, however, that the court also had a duty sua sponte to tell the jury the elements of the specific violation of the Controlled Substances Act from which the prosecution claimed the money found in his car trunk was derived, i.e., unlawful sale of marijuana.

34

In his opening brief, defendant presents the barest of arguments on this point, citing two cases for the general propositions that "a jury must be properly instructed on the relevant law" (*McDowell v. Calderon* (9th Cir. 1997) 130 F.3d 833, 836, overruled in part on other grounds by *Weeks v. Angelone* (2000) 528 U.S. 225), and a court must ensure adequate instruction "on the law governing all elements of the case . . . to the extent necessary for a proper determination." (*People v. Iverson* (1972) 26 Cal.App.3d 598, 604-605, disapproved on other grounds in *In re Earley* (1975) 14 Cal.3d 122, 130, fn. 11.) He does not attempt to apply these general principles or explain why they compel the conclusion that the court had a duty sua sponte to instruct on the elements of an uncharged violation of the Controlled Substances Act.[20]

Although no court as yet has discussed section 11370.9, subdivision (a) or the requirements for proving a violation, defendant does not attempt to fill that void by examining case law involving analogous statutes, for example, other federal or state money-laundering statutes containing a similar knowledge requirement (see, e.g., 18 U.S.C. § 1956(a)(1) [A defendant must "know[] . . . the property involved . . . represents the proceeds of some form of unlawful activity"]; Pen. Code, § 186.10, subd. (a) [A defendant must "know[] that the monetary instrument represents the proceeds of . . . criminal activity"]), or statutes criminalizing conduct involving commission of an uncharged felony. (See, e.g., Pen. Code, § 32 [It is a crime, "after a felony has been committed," to harbor, conceal, or aid "a principal in such felony"].) As the California Supreme Court has observed, however, " '[e]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration.' " (*People v. Stanley* (1995) 10 Cal.4th 764, 793.) Defendant's submission in support of his argument about instructional error is so conclusory and lacking in substantive analysis

---

[20] Continuing a pattern, defendant better explains his argument in his reply brief, and provides more case law, but none of that authority focuses on precisely the point defendant attempts to make here.

35

that it risks being dismissed as waived. The People follow suit, presenting a cursory response on the merits, suggesting defendant's failure to request clarifying or amplifying language in the instruction means he forfeited it. Nonetheless, we consider the merits of the issues the parties have sketched.

As an initial point, we agree a "trial court must instruct the jury on all elements of the charged offenses." (*People v. Mays* (2007) 148 Cal.App.4th 13, 36 (*Mays*), citing *People v. Flood* (1998) 18 Cal.4th 470, 480; see, e.g., *People v. Hillhouse* (2002) 27 Cal.4th 469, 503 ["Instructions regarding the elements of the crime affect the substantial rights of the defendant, thus requiring no objection for appellate review"].) A party may not argue on appeal, however, "that an instruction correct in law was too general or incomplete, and thus needed clarification, without first requesting such clarification at trial." (*Hillhouse*, at p. 503.) The question then is whether the elements of the offense—violation of section 11370.9, subdivision (a)—included the elements of the uncharged violation of the Controlled Substances Act from which the proceeds are alleged to have been derived, creating a sua sponte duty of the court to instruct the jury on the latter.[21]

Confronting a similar question in *United States v. Martinelli* (11th Cir. 2006) 454 F.3d 1300, that court answered in the negative. The defendant in that case was charged with conspiring to launder money in violation of 18 U.S.C. section 1956(a)(1). The provision makes it a crime to knowingly attempt to conduct a financial transaction that involves the proceeds of a "specified unlawful activity," knowing the transaction is designed to conceal an attribute of the proceeds. (18 U.S.C. § 1956(a)(1)(B)(i); see *id.,* § 1956(c)(7) [defining "specified unlawful activity" as including a long list of crimes].) The defendant there contended the lower court erred by failing to instruct the jury on the basic elements of mail fraud, the uncharged "specified unlawful activity" underlying the alleged money-laundering conspiracy in question, arguing that mail fraud was a " 'core

_____

[21] Defendant does not contend that he objected to the jury instruction below as incorrect or incomplete, or that he requested an additional instruction.

36

element of the offense.' " (*Martinelli,* at p. 1310.)  The Eleventh Circuit rejected the argument, reasoning that the defendant "was not charged with mail fraud and the government did not have to prove he committed mail fraud to convict him of conspiring to launder money."  (*Id.* at p. 1311.)  "In fact," it continued, "the government did not have to prove any of [the] elements [of mail fraud]; [the defendant] simply had to *know* the funds were derived from the specified unlawful activity of mail fraud."  (*Ibid.*)

In an analogous case, *People v. Shields* (1990) 222 Cal.App.3d 1 (*Shields*), a California Court of Appeal reached a similar conclusion.  The defendant there was convicted of being an accessory to murder after the fact and claimed instructional error.  (*Id.* at p. 3.)  Although the jury had been instructed on the elements of accessory to a felony, and the felony was identified as murder, the instruction did not include the elements of murder.  (*Id.* at p. 4.)  Observing that it found no cases concluding that a trial court had a sua sponte duty to include the elements of the uncharged felony (murder) when instructing on the charge of accessory, the court considered several analogous cases involving charges of assault likely to produce great bodily injury.  (*Id.* at pp. 4-5, citing *People v. Miller* (1981) 120 Cal.App.3d 233, 236; *People v. Kimbrel* (1981) 120 Cal.App.3d 869, 876; *People v. Roberts* (1981) 114 Cal.App.3d 960, 964-966.)  In three of those cases, the courts had concluded a sua sponte instruction defining "great bodily injury" was not required.  (*Shields,* at p. 5.)  In the fourth case, "the court found that it was unnecessary to amplify the definition of great bodily injury that was given to include specific examples."  (*Ibid.,* citing *People v. La Fargue* (1983) 147 Cal.App.3d 878, 886.)  *Shields* found these cases persuasive.  (*Shields, supra,* 222 Cal.App.3d at p. 5.)  Turning to the charge of accessory, it reasoned, "All that was needed was proof that a felony had been committed."  (*Ibid.*)  Defining that felony in the instruction as murder sufficed as "the jury was not required to find a technical first degree murder in order to convict defendant of being an accessory to a felony."  (*Ibid.*)

More generally, courts have agreed that "[t]he statutory language defining a crime 'is generally an appropriate and desirable basis for an instruction . . . .  If the jury would have no difficulty in understanding the statute without guidance, the [trial] court need do

37

no more than instruct in statutory language.' " (*Mays*, *supra,* 148 Cal.App.4th at p. 36, quoting *People v. Poggi* (1988) 45 Cal.3d 306, 327.) " '[T]erms are held to require clarification by the trial court when their statutory definition differs from the meaning that might be ascribed to the same terms in common parlance.' " (*Mays*, at p. 36, quoting *People v. Estrada* (1995) 11 Cal.4th 568, 574-575.)

In this case, the trial court instructed the jury in the statutory language of section 11370.9, subdivision (a). On the second element—knowing the money he received or acquired was derived from a violation of the Controlled Substances Act—the court instructed that possession for sale of marijuana was an example of such a violation. The prosecution suggested an unlawful sale of marijuana was another example, arguing that the evidence showed defendant had acquired the money by conducting a sale himself. The offense of unlawfully selling marijuana includes just two elements—"(a) a sale of marijuana and (b) knowledge of the character of the substance sold." (*People v. Van Alstyne* (1975) 46 Cal.App.3d 900, 906; see CALCRIM No. 2350, citing *Van Alstyne*, at p. 906.) This is not a technical or peculiar legal definition, and there is no suggestion in the record the jury was confused on this issue. Nor does defendant argue the jury actually was misled.

Although in *People v. Magee* (2003) 107 Cal.App.4th 188, another Court of Appeal disagreed with *Shields, supra,* 222 Cal.App.3d 1 about the need to include instruction on the elements of the felony to which a defendant is charged with being an accessory, the alleged felony in *Magee* was robbery and the elements of robbery are more complex. (*Magee,* at pp. 191-193; see, e.g., *People v. Clark* (2011) 52 Cal.4th 856, 943 ["Robbery is the taking of 'personal property in the possession of another against the will and from the person or immediate presence of that person accomplished by means of force or fear and with the specific intent permanently to deprive such person of such property"].) In concluding that the trial court there had a duty to instruct on the elements of robbery, *Magee* reasoned that the jury otherwise "[would] not know the facts the prosecution must prove to establish the underlying felony" and would be left "to guess or speculate." (*Magee,* at pp. 192-193.) In this case, in contrast, we think the jury easily

38

would have understood what possession for sale or sale of marijuana entailed, without specific instruction.

Even if the court did have a sua sponte duty to instruct on the elements of an unlawful sale of marijuana, however, we conclude the omission in this case qualified as harmless error. (See, e.g., *People v. Gonzalez* (2012) 54 Cal.4th 643, 666 [harmless error test applies for instruction that erroneously omitted element of offense].) In this context, a demonstration of harmless error requires "proof beyond a reasonable doubt that *a rational jury* would have found the defendant guilty absent the error." (*Ibid.*, citing *Neder, supra*, 527 U.S. at p. 18.) Where, for example, a defendant contests the omitted element "and raised evidence sufficient to support a contrary finding," a court should not find the error harmless. (*People v. Mil, supra*, 53 Cal.4th at p. 417.)

Here, as noted, four law enforcement officers from three different agencies testified defendant's car smelled strongly of marijuana when he was stopped. Three officers saw small particles in the car that they recognized as marijuana. A trained narcotics dog known to be highly accurate signaled that he detected the smell of a controlled substance in defendant's car, at the lid of the car's trunk, and on the cash ($46,959) concealed there. The money was found in packaging that an expert testified, and numerous federal courts have observed, is commonly used to conceal the smell of drugs and avoid detection by drug dogs. (See, e.g., *United States v. $42,500.00 U.S. Currency*, *supra,* 283 F.3d at p. 982 ["Unlike a purse or money pouch, cellophane is not a normal repository for carrying large amounts of money"].) The defendant admitted to a police officer he had touched marijuana earlier in the day.

When stopped, defendant's car contained a shopping list for gardening supplies, and a receipt for the purchase of wood, part of a gate, and a privacy lattice that could be used to conceal a tall outside marijuana grow. It also contained a legal pad with notations, such as "SD" and a number, which an expert testified was common drug sellers' shorthand for tracking sales of particular marijuana strains, including "Sour Diesel." Defendant gave the police conflicting and unsupported explanations of the source of the cash found in his car, first maintaining it came from his ATM business and

39

later suggesting it was a gift from his mother. No documentation or testimony was offered at trial to confirm either explanation, and a narcotics detective testified he could find no record with the State Board of Equalization or on the Internet indicating the ATM business existed.

Although defendant told the police he kept the $46,959 in cash with him in his car to ensure its safety, he did use a bank account to hold other cash deposits totaling $113,000. No evidence was offered to explain defendant's different handling of these cash amounts. Evidence was presented, however, that defendant used electronic money transfers and cash for large purchases, a practice that an expert testified had the effect of avoiding a paper trail indicating the money's source. Despite defendant's claims that he operated an ATM business and evidence that he received and deposited at least $113,000 in cash over the course of the preceding two years, defendant told the police he had not filed tax returns in that period. Based on all of this evidence, an expert in the identification, sales, and distribution of controlled substances concluded defendant acquired the $46,959 found in his car from marijuana sales. (See, e.g., *People v. $47,050* (1993) 17 Cal.App.4th 1319, 1325 ["[A]n expert's opinion on an ultimate issue of fact is admissible, and may constitute substantial evidence"].)

In *People v. Mitchell* (1994) 30 Cal.App.4th 783, the Court of Appeal found less evidence—a trained narcotics dog alerting to money in defendant's possession, packaging of the money in a manner used by collectors of drug proceeds, untruthfulness about the money's source, and expert testimony—was "ample" to prove beyond a reasonable doubt the defendant there knowingly acquired the money from a violation of the Controlled Substances Act. (*Id.* at pp. 803-804.)[22] We conclude that the evidence in this case proved beyond a reasonable doubt that if the trial court had included instruction on the elements of an unlawful sale of marijuana, it would not have altered the jury's

---

[22] In that case, the defendant was charged with knowingly possessing over $100,000 obtained from drug sales in violation of Health and Safety Code section 11370.6. (*People v. Mitchell, supra,* 30 Cal.App.4th at pp. 790, 800.)

40

verdict.  A rational jury would have concluded defendant knew the money discovered in his car came from the unlawful sale of marijuana.

We have reviewed the record to determine whether it " 'contains evidence that could rationally lead to a contrary finding with respect to the omitted element' " of knowing the money in question derived from violation of the Controlled Substances Act. (*People v. Gonzalez, supra,* 54 Cal.4th at p. 1261, quoting *Neder, supra,* 527 U.S. at p. 19.)  We have concluded no rational juror could find defendant lacked such knowledge.  Attempting to avoid this conclusion, defendant cites only the statements he made to the police that the money came from a legitimate ATM business.  No evidence was offered indicating such a business actually existed, however, and defendant does not dispute he also provided a contradictory explanation that his mother gave him the money. (See, e.g., *People v. Player* (1958) 161 Cal.App.2d 360, 362 ["Inconsistent statements relevant to the crime charged . . . . tend[] to show a consciousness of guilt"]; *People v. Carrillo* (1995) 37 Cal.App.4th 1662, 1669-1670 [evidence of false exculpatory statements "suggest that there is no honest explanation for incriminating circumstances"].)  Even if the trial court erred in not instructing the jury on the elements of an unlawful sale of marijuana, it was harmless error.

### III.  DISPOSITION

The judgment is affirmed.

_____
Rivera, J.

We concur:

_____
Ruvolo, P.J.

_____
Streeter, J.

Trial Court: Solano County Superior Court

Trial Judge: Honorable Gary A. Medvigy

Counsel for Appellant: Walter K. Pyle, under appointment by the First District Appellate Project

Counsel for Respondent: Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Acting Senior Assistant Attorney General, Catherine A. Rivlin, Supervising Deputy Attorney General, Allan Yannow, Deputy Attorney General