Filed 10/1/25  P. v. Williams CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR


| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>RICKY MARSHAWN WILLIAMS,<br><br>Defendant and Appellant. | B331614<br><br>(Los Angeles County Super. Ct. No. BA506431) |

APPEAL from judgment of the Superior Court of Los Angeles County, Shelly B. Torrealba, Judge.  Affirmed as modified.

Patricia Lai, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant

Attorney General, Steven D. Matthews and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

---

Appellant Ricky Williams followed victim Luis Fernando Lopez to a bus stop and struck him numerous times with a metal pole. Lopez died of blunt force head trauma as a result. Appellant was charged with his murder.

Appellant exercised his right to represent himself throughout all stages of the proceedings and repeatedly reaffirmed his desire to do so. The trial court denied appellant's request to instruct the jury with CALCRIM No. 508, Justifiable Homicide: Citizen Arrest (Non-Peace Officer), though it allowed appellant to argue that he was attempting to effectuate a citizen's arrest of Lopez. The jury rejected this theory, but also rejected the People's theory of first degree murder; it found appellant guilty of second degree murder.

Appellant argues that the trial court erred by allowing him to represent himself without first advising him of the maximum punishment he faced or conducting a hearing to determine his mental competency. He also contends the court deprived him of his right to present a defense by declining to instruct the jury with CALCRIM No. 508, which he asserts was supported by substantial evidence. Appellant argues that these errors were individually and cumulatively prejudicial.

We reject these contentions and affirm. However, we agree with appellant and respondent Attorney General that the judgment must be modified to award appellant one additional day of presentence custody credit. The judgment is affirmed as modified.

2

# FACTUAL BACKGROUND

## I. Prosecution Case

### A. Incident

Brandon Rogers testified at trial that he was at a bus stop at the corner of Santa Monica Boulevard and Vermont Avenue early in the morning of May 18, 2022. He heard yells for help and saw a person "getting beat with a stick." Rogers identified appellant in a six-pack photo array and in court as the person wielding the stick.

Rogers testified that appellant struck the victim approximately five times, knocking the victim to the ground. Appellant continued to strike the victim, "more than once," while the victim lay on the ground in what Rogers described as a "defensive" posture. Rogers stated that the "stick was really moving," and used his hand to demonstrate "somewhat of a tomahawk action." Rogers did not see the victim fight back or display a weapon.

Rogers testified that a woman "came out of nowhere" and pepper sprayed appellant in the face multiple times. Appellant then fled the scene. When he spoke to police about the incident, Rogers told them that appellant attacked the victim because the victim had raped someone. Rogers refused to answer further questions about the statement.

Two people driving in the area at the time also testified about the incident. Aidan Yood-Howard testified that he was on Santa Monica Boulevard waiting to turn onto Vermont Avenue around 12:30 or 1:00 a.m. when he heard "a really quick and loud shout" behind him. Yood-Howard checked his rearview mirror and "saw what looked like two figures and it was really dark so just shadows. And then followed by the sound of thumping and

3

grunting and groaning kind of." Yood-Howard described the grunting "as if somebody was putting effort into the strikes that were being thrown," and the groaning "as if someone was being attacked." Yood-Howard said it was "[d]efinitely one person attacking the other," and "[a]t one point one of them ended up on the floor and it didn't stop." He estimated he heard "at least 10" thumps.

Yood-Howard made a U-turn and got closer to the scene. He saw a woman pepper spray the assailant, who then left. The woman screamed for help and told Yood-Howard to call 911, because the victim was "unresponsive" and there was "blood all over the floor." Yood-Howard called 911; a recording of his call was played for the jury and admitted into evidence. On cross-examination, he testified that he did not recall hearing "metal hitting the ground or metal hitting metal," and did not hear "anyone yelling 'help rapist, help, help.'"

Juan Reyes testified that he was also driving nearby when he saw and heard a man banging a metal pole on the wall. While he was stopped at the intersection of Santa Monica and Vermont, a woman standing in the street told him to call the police because someone had been assaulted. Reyes went through the intersection, then made a U-turn to look for the man he had seen with the pole, because the woman "told me it was him." Reyes did not see the man, so he parked his car and went to the bus stop to see what was going on. He saw a victim "laying down on the floor full of blood," bleeding from "his whole head." Reyes testified that the victim was unconscious and was not moving. Reyes called 911; recordings of his calls were played for the jury and admitted into evidence.

4

Los Angeles Police Department officer Nicholas Velasco testified that he and his partner responded to the scene at about 1:10 a.m. Velasco saw the victim lying still on the ground at the bus stop. There was blood coming out of his skull, and "it seemed like there was brain matter that was scattered on the ground below." Velasco took statements from witnesses, including Rogers. He was not able to determine a motive behind the attack.

The victim was identified as Luis Fernando Lopez. A deputy medical examiner opined that the cause of his death was blunt force head trauma, and the manner of death was homicide. No toxicology test was performed because Lopez was hospitalized for more than 24 hours before he died.

## B. Surveillance Video

LAPD officers gathered surveillance video recordings from several businesses near the incident. The videos were played for the jury and admitted into evidence.

Video from a convenience store showed a man enter at about 12:47 a.m. on May 18, 2022. He was holding a pipe in his hand. A still photo captured from the footage showed that the man had a tattoo that appeared to include an "F" on his right forearm. The man left the store at about 12:48 a.m.

Video from a flooring business showed a man on a bicycle approach the front entrance around 12:41 a.m. on May 18, 2022. A few minutes later, another man carrying a backpack approached. Appellant later testified that the man with the backpack was Lopez. Lopez stood near the business, "looking down, possibly at a phone." He sat down after a few minutes.

At around 12:52 a.m., a third man approached the flooring business from across the street. He was holding "a stick, a pipe,

5

some kind of long item" in his hand.  The man with the stick appeared to talk to Lopez and the other man.  Shortly thereafter, Lopez got up and walked away; he could be seen crossing the street.  Video from another business showed him walking toward the bus stop.

As Lopez walked toward the stop, the man with the stick appeared to be following him and ran toward him from across the street.  Lopez and the man with the stick appeared to engage in "some kind of altercation," from which Lopez appeared to retreat. The men moved into shadows, and Lopez disappeared from view.

### C.    Arrest of Appellant

On July 7, 2022, several weeks after the incident, LAPD officers responded to a call about a person "armed with a knife acting strange."  As the officers were speaking to the caller, appellant approached the police vehicle on foot.  He was "armed with a crowbar or what appeared to be a crowbar."  Officer Adrian Dominguez testified that he noticed a tattoo on appellant's right forearm that appeared similar to that "identified in the crime flyer for a wanted murder suspect."  Dominguez and his partner ordered appellant to drop the crowbar and get on the ground, but he instead "fled on foot."  Police apprehended and arrested him approximately 30 minutes later.

On cross-examination, appellant testified that the item he had when he approached the police was not a crowbar but a "metal rod" that had "been molded into a seven."  Appellant further testified that he had been using the rod to "edge up" rocks along grass nearby.

## II. Defense Case

### A. Appellant's Testimony

The defense case consisted primarily of appellant's testimony. The court allowed him to narrate his testimony because he was representing himself.

In the early morning hours of May 18, 2022, appellant went to the area of Santa Monica and Vermont "to deliver a box of goods to the community." While he was there, he ran into a friend and they made plans to meet at the convenience store for pizza and a drink. Appellant went to the convenience store, but the friend never showed up. "[A]long the way," appellant "just happened to see a stick" and picked it up. Appellant described the stick as a "very light" "flute like instrument" that had "nothing to do with this situation." He planned to put it in his "collection" of "certain metals, things of that nature."

After going to and from the store several times to look for his friend, appellant headed toward the train station to catch a bus home. He "came across the tent with the young person crying inside"; he could hear the person sobbing from across the street. Appellant also heard the person yell "you raped me, you f'ing raped me." Appellant crossed the street and "stopped to intervene." The person in the tent told appellant that "Mr. Fernando had raped them." Appellant "stayed there" and attempted "to make sure they weren't messing around or nothing like that." The person, whom appellant could not see, told appellant the rapist's name was "Fernando Lopez." Appellant believed the person, even though he had never met him or her before.

Appellant, who had never met Lopez before, testified that Lopez was "smoking out of a meth pipe" nearby. "His pants were

7

undone and his genitalia was out," and he "started getting antsy and nervous." Appellant observed tattoos on Lopez's arms.

Appellant did not have a cell phone, so he "couldn't just call the police." He again asked the person in the tent if "this guy" raped them. The person responded, "yes, what do you f'ing think" and zipped up the tent.

Appellant tried "to motion to somebody" at the convenience store a block away to call the police. He then told Lopez to wait there to talk to the police. Lopez started walking away and told appellant he would shoot him. Appellant believed Lopez had a gun and took the threat seriously.

Because he could not "get somebody to call the cops" and also keep track of where Lopez "was going at the same time," appellant "went after him with the instrument in my hand." Appellant intended to "apprehend him, detain him for law enforcement. Do a citizen's arrest and just detain him." On cross-examination, appellant agreed that he thought he would be able "to detain a fleeing suspect with a gun high on methamphetamine by" himself.

Appellant followed Lopez as he walked toward the bus stop. When appellant "tried to do the apprehension attempt," Lopez "was very hostile" and "brandished what appeared to be a gun." Lopez "was posturing himself in a combative manner, making threats, gang threats." Appellant, who had "PTSD over firearms," "was in fear of losing my life" as Lopez "went to a drawing motion." Lopez "charged," and appellant struck him "once or twice" with the instrument "to prevent the gun." Appellant testified that he struck Lopez on the shoulder or waist, and Lopez stumbled and fell to the ground.

8

Appellant also stumbled and fell. He continued to strike Lopez with the stick "to subdue him in order to prevent the gun from coming out." Appellant testified that he struck Lopez "more than twice," but did not recall where because "[i]t happened so fast, it's a blur." Appellant estimated he hit Lopez a total of four to six times. Appellant then stood up and "kicked" what he believed to be "the butt of a gun or a taser" away from Lopez's hand. Lopez was "just laying" and "was not bleeding."

Appellant banged the stick on the ground and yelled "Help, help rapist, rapist, help, help" in an effort to get someone's attention. Someone approached appellant from behind, and "to my surprise they didn't help me. They started pepper spraying me." The pepper spray "was to the point of severity where I had no choice but to leave the vicinity." Blinded, in a panic, and still in fear of Lopez, appellant left the scene and walked down the street. He encountered a group of men and told them to call the police, but they laughed and said no.

Appellant regained his eyesight after what felt like two hours. He then returned to the scene, but to his "surprise there was nothing there." "There was no law enforcement, . . . there was no blood, there was no crime scene tape, there was no witness, there was no rapist, there was no assaulter, there was nobody there."

Appellant did not report the incident to police at that time. He "didn't even know this person was severely injured at all," and would have reported the incident if he had known. He also did not report the incident later. He testified that his brother-in-law and grandmother advised him not to call the police.

Appellant admitted that he had a criminal history and was on probation when the incident occurred. He testified that none

9

of his past crimes was violent; a domestic violence conviction was for a "verbal aspect" with his wife.

**B.    Additional Evidence**

Appellant's brother, Raevaughn Short, testified that he knew appellant to be helpful and nonviolent. Appellant had a tattoo on his arm that said "God First."

**PROCEDURAL HISTORY**

Appellant was arrested on July 7, 2022. On July 22, 2022, prior to his preliminary hearing, appellant advised the court he wanted to represent himself. The court granted appellant's request; we discuss the details further below. Appellant declined to waive time and proceeded to the preliminary hearing on July 25, 2022. On August 8, 2022, the People filed an information charging him with Lopez's murder (Pen. Code, § 187, subd. (a)).[1] The information also alleged several aggravating factors pursuant to California Rules of Court, rule 4.421, including that appellant was on probation at the time of the offense.

Appellant exercised his speedy trial rights and proceeded to jury trial on October 6, 2022. The jury found appellant guilty of second degree murder on October 18, 2022. The People subsequently dismissed the aggravating factor allegations.

Appellant filed several post-trial motions, including a motion for new trial. The trial court denied the motions after hearing. It also found that appellant violated his probation by committing the murder.

On July 6, 2023, the trial court sentenced appellant to the statutorily mandated sentence of 15 years to life. The trial court awarded appellant 364 days of presentence custody credit. The

---

[1]    All further statutory references are to the Penal Code unless otherwise indicated.

court imposed a concurrent sentence of 16 months for the probation violation, which amounted to time served after his custody credits were taken into account.

Appellant timely appealed.

## DISCUSSION

Appellant contends that the trial court failed to obtain a knowing and intelligent waiver of his right to counsel because it did not inform him of the maximum punishment he faced or conduct a competency hearing prior to granting his request to represent himself. He also argues that the court should have instructed the jury with CALCRIM No. 508, and that he is entitled to one additional day of presentence custody credit.

## I.    Self-Representation

### A.    Additional Background

Appellant notified the court that he wanted to represent himself on July 22, 2022, at a hearing on his counsel's motion to continue the preliminary hearing to, in the court's words, allow "necessary preparation, receipt of discovery, and further investigation that is required . . . in a charge of this magnitude." The court immediately provided appellant with a *Faretta*[2] advisement and waiver form and the opportunity to review and complete it.

Appellant completed the four-page form, signing the certification that he had "read, understood and considered all of the above warnings included in this petition, and I still want to act as my own attorney.  I freely and voluntarily give up my right to have an experienced professional attorney represent me."  In the "Personal Information" section of the form, appellant wrote that he was 35 years old and had an AA degree from "vocational

---

[2]     *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).

11

college." He also wrote that he had previously represented himself in 2019, and obtained an acquittal. In that same section of the form, appellant checked "Yes" next to the statement, "I have been examined by a psychiatrist or psychologist to determine my mental competence to proceed in a criminal case." He checked "No" next to the statement, "When I previously represented myself, my pro per privileges were suspended and/or my pro per status was revoked."

The form included numerous pre-printed advisements under the headings "Constitutional Rights," "Dangers and Disadvantages to Self-Representation," "Charges and Consequences," and "Court's Advice and Recommendation." Each advisement had a box for appellant to initial; he initialed every one. The form was general in nature; although it mentioned charges, defenses, and sentencing options, the form did not specify the specific charges or punishment appellant faced.

After appellant completed the form, the court held a hearing with him in open court. The court asked appellant if he had read and understood the form and freely and voluntarily initialed and signed it. Appellant said he had. The court then stated, "Mr. Williams, you have before this court an open case where the charge is murder and you have a probation violation case. You understand that you are charged with a very serious crime and with a probation violation currently?" Appellant responded, "Yes, Ma'am." Appellant also stated that he understood that he had the right to an attorney and one would be appointed for him if he could not afford one. Additionally, he acknowledged the court's comment that he may be "too involved in the case" to be objective.

The court then asked appellant about his previous self-representation.  Appellant told the court it was for assault with a deadly weapon and "two counts of 422," criminal threats.  The court responded, "Okay.  So you understand, this is a much more serious charge than that one.  You understand that?"  Appellant said he did.  The court did not ask appellant about the form question regarding his previous competency examination.

The court advised appellant that he would be opposed by a "very experienced prosecutor in this matter," would not receive any "special treatment" or "helpsies" from the court, and would be treated "the same as an attorney would be."  Appellant responded that he understood, and further stated he understood that he "may have limited access to funds and books and access to the library," and did not have the right to a standby attorney.

The court further advised, "You understand the court is not going to advise you of the elements, any potential consequences you might have, or anything of that nature."  Appellant said he did.  The court asked him if, "knowing all of these things, you still want to represent yourself."  Appellant confirmed that he did.

The court then stated, "This is a very, very serious charge, Mr. Williams. It is a case that I don't know anything about, your case; but it is a case where there may be a lot of experts to be appointed.  There may be a lot of evidence that may need to be examined.  Again, I don't know anything about it. I am just saying, generally speaking, in these cases, a lot of investigation is required.  Your abilities are going to be hampered because you are representing yourself. I want to make sure that you understand. You are telling me you don't want to waive time. You don't even have the discovery.  Do you see what I am saying?"  Appellant said he did, and again answered yes to,

13

"knowing all this, this is what you want to do?" The court found that appellant "has knowingly, expressly, understandingly, and intelligently waived the right to be represented by an attorney" and granted pro per status.

Appellant's self-representation was not addressed at the July 25, 2022 preliminary hearing. At the conclusion of the hearing, the court found sufficient cause to support filing of a murder charge.

At the next hearing, on September 9, 2022, appellant appeared with his investigator and standby counsel. Appellant told the court that he had been "having a problem with my pro per status" and had not been transferred to the pro per housing module in the jail. The court noted that "On July 28, your pro per status was suspended by the Sheriff's Department due to your mental health needs and you've been ordered to a high observation housing location until further notice." Appellant responded, "I'm actually in G.P. population up in Wayside at this point. I exercised my rights on the 22nd and they never moved me to the pro se module. I was observed by a clinician I believe August 24 and August 27, and from there, the clinician he declassified me to general population. I submitted a grievance in regards to the situation and the matter. I put on there that it was an emergency and I was headed to trial and I needed the pro se module and be able to have to pro se funds for the reasons [*sic*]. I still haven't received anything. It's been outside the two week period." Appellant nevertheless filed multiple substantive motions.

Appellant's investigator then advised the court that appellant had "been moved around a few times," and, "[b]ased on his mental health issue, he was housed at Twin Towers" "up until

14

like the last seven days." The investigator stated that he had been unable to meet with appellant because the elevators at Twin Towers were broken. However, he also reported, "They declassified him, I checked with Legal yesterday. He's now pro per in general population module up at N.C.C.I. As soon as they get notification he's pro per they will get him back down to county jail if his pro per status is still available at that level. There may be other reasons why he's not a pro per at the county jail."

The court then told appellant that "it appears that there are some underlying issues regarding you and your status. . . . [I]f you're still requesting to represent yourself with all of these impediments, it does not appear that it's really in your best interest to do so. Not in your best interest to do so without the impediments, but the issues that are going on with the facility and all of that, I have no control over that. However, if you are going to continue to represent yourself, I'll ask that it be included in the minute order and that appropriate housing arrangements be taken into consideration by the Sheriff's Department in line with their rules and regulations and guidelines for you to be able to be housed in the pro per module. If you don't meet the requirements, then this court because of your actions and your health care needs, including mental health issues, then your status will continue to be suspended until you meet the requirements of being able to be within the pro per module." Appellant told the court he wanted to proceed despite the challenges and declined to waive time.

At the next hearing, on September 27, 2022, appellant appeared with his investigator and standby counsel. Appellant filed four additional motions, including a motion to exclude evidence of his arrest as irrelevant to "the murder charge on

15

5/18." After hearing argument on appellant's motions, the court discussed timing and procedural issues with the parties. During those discussions, the court asked, "Maximum exposure in this case is life?" The prosecutor responded "Yes." The court then asked what the People's last plea offer had been, and the prosecutor said, "none has been asked for." Appellant told the court he would "entertain an offer" from the People, and stated that he had included in a previous motion a willingness to plead to "involuntary manslaughter (b)." He explained, "It was basically [section] 197(4). It was justifiable homicide while trying to apprehend an individual for law enforcement while committing a rape [*sic*]."

At the next hearing, on October 5, 2022, the prosecutor made a plea offer of 25 years to life. Appellant said he would not accept that and again offered to plead to "involuntary manslaughter 192 (b)." The prosecutor declined.

During a continuation of the hearing later the same day, the court asked appellant if he still wanted to represent himself at trial. It reminded him that standby counsel was there, and also that he would be held to the same standard as counsel. The court further stated, "And are you absolutely certain that, especially based on the gravity of the case, this is a murder first degree murder [*sic*] with the possibility of penalty of 25 years to life that you want to represent yourself in this case?" Appellant said "Yes."

Later still in the October 5, 2022 hearing, the court asked appellant about his desire to represent himself "one more time to make sure the record is clear because this is a very serious case. I understand that you don't want to waive time. You have been told by your expert that he has not reviewed the reports … and

that at this time may not be able to render an opinion to assist you with your defense.  And knowing all that, you still want to proceed with your trial.  So we're starting jury selection tomorrow."  Appellant responded, "Yes."  During a subsequent discussion of the jury selection process, the court explained that both sides would receive 20 peremptory challenges "because this is a life case."  The court also cautioned appellant not to mention in front of the jury "what the punishment or penalty would be in this matter."  Appellant responded, "Understood, understood."

The following day, the first day of trial, the court again asked appellant "if you still wish to continue representing yourself before we call the jury panel in, we do have standby counsel and counsel would be prepared and ready to go forward with the trial. However, during the trial, you won't be permitted to ask her any questions or request that she step in during the middle of the trial that would probably result in possibility of a resulting mistrial and a delay for your process.  Do you understand?"  Appellant responded, "Yes, Your Honor."  The court clarified, "So you still wish to represent yourself in this matter?"  Appellant said, "Correct."  The matter proceeded to trial, and appellant represented himself throughout.

### B.     Knowing, Intelligent, and Voluntary Waiver

The Sixth Amendment of the United States Constitution guarantees the right to counsel in criminal prosecutions. (U.S. Const., 6th Amend.)  It also guarantees a defendant the "constitutional right to proceed without counsel when he voluntarily and intelligently elects to do so." (*Faretta, supra,* 422 U.S. at p. 807; see also *id.* at pp. 819-821.) A defendant's decision to forgo counsel must be made "'knowingly and intelligently.'" (*Id.* at p. 835.)  "A valid waiver requires that the defendant 'have the

17

mental capacity to understand the nature and object of the proceedings against him or her,' and that the defendant waives the right knowingly and voluntarily." (*People v. Mickel* (2016) 2 Cal.5th 181, 211 (*Mickel*).) The defendant "should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'" (*Faretta*, *supra*, 422 U.S. at p. 835.)

"In deciding whether a waiver is knowing and voluntary, we examine the record as a whole to see whether the defendant actually understood the consequences and import of the decision to waive counsel, and whether the waiver was freely made." (*Mickel*, *supra*, 2 Cal.5th at p. 211.) For a waiver to be valid, "the record as a whole must establish that the defendant understood the 'dangers and disadvantages' of waiving the right to counsel, including the risks and intricacies of the case." (*Id.* at p. 212.) "We review a *Faretta* waiver de novo, and examine the whole record to determine the validity of a defendant's waiver of the right to counsel." (*Ibid.*) The "whole record" includes proceedings after the defendant invoked the right to self-representation. (*People v. Bush* (2017) 7 Cal.App.5th 457, 469 (*Bush*).) The defendant bears the burden of showing that the waiver of counsel was not knowing and intelligent. (*People v. Mellor* (1984) 161 Cal.App.3d 32, 37.)

Appellant argues that the waiver of counsel cannot be knowing and intelligent absent an express advisement of the maximum punishment the defendant faces. He relies principally on *Iowa v. Tovar* (2004) 541 U.S. 77 (*Tovar*), which considered "the extent to which a trial judge, before accepting a guilty plea from an uncounseled defendant, must elaborate on the right to

representation."  (*Id.* at p. 81.) *Tovar* specifically considered whether the trial court was required to "(1) advise the defendant that 'waiving the assistance of counsel in deciding whether to plead guilty [entails] the risk that a viable defense will be overlooked'; and (2) 'admonis[h]' the defendant 'that by waiving his right to an attorney he will lose the opportunity to obtain an independent opinion on whether, under the facts and applicable law, it is wise to plead guilty." (*Ibid.*)  *Tovar* held that neither of those particular admonitions was constitutionally required.  (*Id.* at pp. 81, 91-92, 94.) It stated that the "constitutional requirement is satisfied when the trial court informs the accused of the nature of the charges against him, of his right to be counseled regarding his plea, and of the range of allowable punishments attendant upon the entry of a guilty plea." (*Id.* at p. 81.)

Appellant argues that the "point of singling out these warnings was to establish a constitutional minimum. Once this minimum has been exceeded, the sufficiency of the advisement is assessed under a totality-of-the-circumstances test. But if the minimum is not exceeded, the advisement is constitutionally inadequate."  We reject this narrow reading of *Tovar*. In summarizing previous Supreme Court precedent, *Tovar* specifically noted that it had not "prescribed any formula or script to be read to a defendant who states that he elects to proceed without counsel," and the "information a defendant must possess in order to make an intelligent election . . . will depend on a range of case-specific factors, including the defendant's education or sophistication, the complex or easily grasped nature of the charge, and the stage of the proceeding."  (*Tovar*, *supra*, 541 U.S. at p. 88.)  Indeed, it reiterated the "eyes open" phrasing

it coined 40 years previously in *Faretta* (see *ibid.*) and endorsed a 'pragmatic approach.'" (*Id.* at p. 90.)

Citing *Tovar*, our Supreme Court similarly has held that "the scope of a proper advisement of the right to counsel depends on the particular facts and circumstances of the case as well as the stage of the proceedings." (*People v. Burgener* (2009) 46 Cal.4th 231, 242 (*Burgener*).) To that end, it has reiterated, as recently as 2016, that "There is no prescribed script or admonition that trial courts must use in warning a defendant of the disadvantages of self-representation." (*Mickel, supra,* 2 Cal.5th at pp. 211-212; see also *People v. Koontz* (2002) 27 Cal.4th 1041, 1070 ["[n]o particular form of words is required in admonishing a defendant who seeks to waive counsel and elect self-representation"], *Burgener, supra,* 46 Cal.4th at p. 241 [same].) In accordance with these binding precedents, several California appellate courts considering the issue have concluded that there is no requirement that a defendant specifically be advised of the "possible penal consequences of conviction" to knowingly and intelligently waive the right to counsel. (*People v. Conners* (2008) 168 Cal.App.4th 443, 456; see also *Bush, supra,* 7 Cal.App.5th at p. 473; *People v. Harbolt* (1988) 206 Cal.App.3d 140, 150.)

Appellant points to *People v. Jackio* (2015) 236 Cal.App.4th 445 (*Jackio*) in support of the contrary conclusion. In *Jackio*, the trial court advised a defendant charged with several crimes "associated with a home invasion," including attempted murder, that he faced life in prison. (*Jackio, supra,* 236 Cal.App.4th at p. 447.) The defendant waived his right to counsel and was convicted. On appeal, he argued that the trial court was obligated to provide "a breakdown of the full range of sentencing

options with respect to the crimes and enhancements charged." (*Id.* at p. 450; see also *id.* at p. 452 ["he claims…the trial court was required to advise him of the full range of punishments he could face for the crimes and enhancements charged"].) The appellate court rejected the defendant's position as impractical and unworkable. (*Id.* at p. 454.) It concluded "the most reasonable solution consistent with case law"—including *Tovar* and *Burgener*—"and the United States Constitution is to require the trial court to advise a defendant desiring to represent himself at trial of the maximum punishment that could be imposed if the defendant is found guilty of the crimes, with enhancements, alleged at the time the defendant moves to represent himself." (*Id.* at pp. 454-455.)

*Bush*, *supra*, 7 Cal.App.5th at p. 469, more recently considered the express question of whether a waiver of the right to counsel was invalid because the trial court "did not warn [the defendant] of all the possible penal consequences if he was convicted." Answering the question in the negative, *Bush* distinguished *Jackio* on the ground that the dispute there "centered on the *adequacy* of the warning," because the defendant there had been advised of the maximum punishment he faced. (*Id.* at p. 473.) *Bush* concluded that the *Jackio* court therefore "presumably did not have occasion to consider critically the question of whether a warning about the maximum potential penalty is always required for a valid waiver of the right to representation at trial." (*Ibid.*) We find *Bush* persuasive and agree with its conclusion that the relevant case law "does not persuade us that a pretrial waiver of counsel cannot be valid if the court did not specifically advise the defendant of all possible penal consequences of the charged offenses, including all

21

monetary fines." (*Ibid.*)  Like *Bush*, we have found no binding case "specifically concluding that an advisement on this point is a constitutional minimum in every case."[3]  (*Ibid.*)

Of course, "the better practice would be to inform the accused, on the record, of the maximum sentence, including any maximum monetary fine that could be imposed on a conviction." (*Bush, supra*, 7 Cal.App.5th at p. 473; accord *People v. Best* (2020) 49 Cal.App.5th 747, 764 ["[w]hile failure to advise on all aspects of potential punishment does not necessarily render a *Faretta* waiver invalid, it is the better practice to provide this information"].)  But we conclude that the presence or absence of an admonition relating to potential punishment is a relevant consideration, not a determinative one, in determining whether the record as a whole evinces a knowing and intelligent waiver of counsel.  (See *People v. Ruffin* (2017) 12 Cal.App.5th 536, 544.)

Appellant contends that "the record suggests that Mr. Williams likely had no idea he might receive 15 to 25 years to life in prison."[4]  We disagree. Although the trial court did not advise appellant of the potential punishment he faced before his initial

---

[3]     The Ninth Circuit cases appellant cites, *United States v. Erskine* (9th Cir. 2004) 355 F.3d 1161 and *Arredondo v. Neven* (9th Cir. 2014) 763 F.3d 1122, are not binding on this court.  (See *People v. Crittenden* (1994) 9 Cal.4th 83, 120 fn. 3.)

[4]     Appellant also asserts that it "is important to note" he initially waived counsel prior to the preliminary hearing, when the People "could still have added more charges and added special circumstances to the murder charge," thereby increasing his potential exposure to the death penalty.  With more charges and allegations on the table, it is unclear how the court could have accurately advised appellant of the maximum potential punishment he faced at this juncture.

*Faretta* waiver, it told appellant that he was charged with murder and repeatedly emphasized the "serious" nature of the charge. Appellant, who holds an associate's degree and previously represented himself successfully, stated that he understood. Given appellant's education, past experience with self-representation, the nascent stage of the proceedings, and the easily grasped nature of the murder charge (see *Tovar*, *supra*, 541 U.S. at p. 88), we are not persuaded that more was required. In any event, the court subsequently advised appellant multiple times before trial that he faced 25 years to life, and appellant's conduct indicated that he understood the gravity of the charge he faced. He filed motions referring to the murder charge and attempted to negotiate a plea to involuntary manslaughter. More importantly, even after being advised of the potential punishment, appellant repeatedly reiterated his waiver of the right to counsel each time the court raised the issue, up to the moment jury selection began. It is clear from this record that appellant knew what he was doing when he repeatedly waived his right to counsel and made his choice with his eyes open to the risks that decision entailed. (See *Faretta, supra*, 422 U.S. at p. 835.) We accordingly find no error.

### C.    Competency Determination

Appellant also argues that the court erred by allowing him to waive counsel without first conducting a competency hearing. Appellant asserts that the court should have inquired about (1) his representation on the *Faretta* form that he underwent a competency exam in his previous case, and (2) the "mental health needs" he experienced during this case. He does not contend he was incompetent; he contends the record suggests he may have

been, and therefore the matter must be remanded for the trial court to retroactively make that determination.  We disagree.

The federal constitution "does not permit trial of an individual who lacks 'mental competency.'" (*Indiana v. Edwards* (2008) 554 U.S. 164, 170 (*Edwards*).)  A defendant is competent to stand trial if he or she "has 'a rational as well as factual understanding of the proceedings against him'" and "'has sufficient present ability *to consult with his lawyer* with a reasonable degree of rational understanding.'" (*Ibid.*)  Where a defendant is competent under these standards, but "suffer[s] from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves," the trial court may prohibit their exercise of *Faretta* rights and "insist upon representation by counsel."  (*Id.* at p. 178.)

The California Supreme Court has adopted this standard. (*People v. Johnson* (2012) 53 Cal.4th 519, 528 (*Johnson*).)  It has further clarified that trial courts "considering exercising their discretion to deny self-representation" on competency grounds should ask "whether the defendant suffers from a severe mental illness to the point where he or she cannot carry out the basic tasks needed to present the defense without the help of counsel." (*Id.* at p. 530.) However, a trial court "need not routinely inquire into the mental competence of a defendant seeking self-representation. It needs to do so only if it is considering denying self-representation due to doubts about the defendant's mental competence." (*Ibid.*) A trial court that doubts a defendant's general competence to stand trial is statutorily required to appoint an expert to examine the defendant and render a competency opinion. (*Ibid.*) "Similarly, when it doubts the defendant's mental competence for self-representation, it may

24

order a psychological or psychiatric exam to inquire into *that* question. To minimize the risk of improperly denying self-representation to a competent defendant, 'trial courts should be cautious about making an incompetence finding without the benefit of an expert evaluation, though the judge's own observations of the defendant's in-court behavior will also provide key support for an incompetence finding and should be expressly placed on the record.'" (*Id.* at pp. 530-531.) "Self-representation by defendants who wish it and validly waive counsel remains the norm and may not be denied lightly." (*Id.* at p. 531.)

We "defer largely to the trial court's discretion" with respect to its determinations concerning self-representation." (*Johnson, supra*, 53 Cal.4th at p. 531.) This is because the trial court has the opportunity to observe and interact with the defendant and therefore "will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant." (*Edwards, supra*, 554 U.S. at p. 177.) "The trial court's determination regarding a defendant's competence must be upheld if supported by substantial evidence." (*Johnson, supra*, 53 Cal.4th at p. 531.)

Here, the record gives no indication that appellant at any point lacked a rational or factual understanding of the proceedings, lacked the ability to consult with an attorney about them, or suffered from a mental illness that rendered him incompetent to conduct trial proceedings by himself. Appellant coherently and appropriately interacted with the court at every juncture, from his first appearance to the conclusion of the sentencing hearing. Appellant completed the *Faretta* form, indicated his understanding thereof, and answered the court's

25

questions. He suggests that his answer regarding his previous competency evaluation alone should have given the court reason to doubt his current competence, but "[e]vidence regarding past events that does no more than form the basis for speculation regarding possible current incompetence is not sufficient" to raise a doubt about a defendant's competence. (*People v. Hayes* (1999) 21 Cal.4th 1211, 1281.) The form also stated that appellant had not previously had his pro per status suspended or revoked, from which the court reasonably could have concluded that appellant was not found incompetent.

Citing a concurring opinion in a case that long predates both *Edwards* and *Johnson*, *People v. Powell* (1986) 180 Cal.App.3d 469, 484 (Poché, J., concurring), appellant similarly asserts that the revelation that he experienced unspecified "mental health needs" outside of court constituted "compelling" evidence of incompetency that necessitated additional inquiry. We disagree. Even while discussing his move from general population to mental health housing and back again, appellant was coherent and focused on his case. He explained to the court that he had filed a grievance, and also filed three motions appropriate to the stage of the proceedings. Moreover, appellant's investigator largely corroborated appellant's account of the issues and timeline, and expressed no concerns about the substance of his interactions with appellant. Appellant's standby counsel and the People also expressed no concern or doubt as to appellant's competence. While some "mental health needs" may impact competence, others may not. The trial court had the opportunity to engage appellant in a colloquy and observe his behavior to determine the extent of appellant's mental health needs. We see no abuse of its discretion.

26

Appellant also argues that we "must remand the matter for further proceedings" because the record suggests his mental state was "uncertain." As already explained, we reject this characterization of the record. We also reject appellant's reliance on *People v. Lightsey* (2012) 54 Cal.4th 668, a facially inapposite case holding that the trial court erred and further proceedings were necessary where the court permitted defendant to represent himself *during* competency proceedings. (*Id.* at p. 674.) Appellant cites no further authority supporting reversal or remand, and we see no basis for either on this record.

## II.    Jury Instructions

Appellant contends that the court erred in failing to instruct the jury with CALCRIM No. 508. We disagree.

### A.    CALCRIM No. 508

CALCRIM No. 508 provides:

"The defendant is not guilty of (murder/[or] manslaughter/attempted murder/[or] attempted voluntary manslaughter) if (he/she) (killed/attempted to kill) someone while trying to arrest him or her for a violent felony. Such (a/an) [attempted] killing is justified, and therefore not unlawful, if:

"1. The defendant committed the [attempted] killing while lawfully trying to arrest or detain _____<*insert name of decedent*> for committing (the crime of _____ <*insert forcible and atrocious crime, i.e., felony that threatened death or great bodily injury*>/_____ <*insert crime decedent was suspected of committing, e.g., burglary*>, and that crime threatened the defendant or others with death or great bodily injury);

"2. _____ <*insert name of decedent*> actually committed (the crime of _____<*insert forcible and atrocious crime, i.e., felony that threatened death or great bodily*

*injury>*/_____*<insert crime decedent was suspected of committing, e.g, burglary>*, and that crime threatened the defendant or others with death or great bodily injury;

"3. The defendant had reason to believe that _____*<insert name of decedent>* had committed (the crime of _____*<insert forcible and atrocious crime, i.e., felony that threatened death or great bodily injury>*/_____*<insert crime decedent was suspected of committing, e.g., burglary>*, and that crime threatened the defendant or others with death or great bodily injury);

"[4. The defendant had reason to believe that _____ *<insert name of decedent>* posed a threat of death or great bodily injury, either to the defendant or to others];

"AND

"5. The [attempted] killing was necessary to prevent _____'s *<insert name of decedent>* escape.

"A person has *reason to believe* that someone [poses a threat of death or great bodily injury or] committed (the crime of _____*<insert forcible and atrocious crime, i.e., felony that threatened death or great bodily injury>>*/_____*<insert crime decedent was suspected of committing, e.g, burglary>*, and that crime threated the defendant or others with great bodily injury) when facts known to the person would persuade someone of reasonable caution to have (that/those) belief[s].

"*Great bodily injury* means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm.

"The People have the burden of proving beyond a reasonable doubt that the [attempted] killing was not justified. If

the People have not met this burden, you must find the defendant not guilty of [attempted] (murder/[or] manslaughter)."

## B.    Additional Background

Appellant testified that he had been attempting to conduct a citizen's arrest of Lopez and acted in self-defense when Lopez appeared to reach for or brandish a handgun.  Near the conclusion of trial, the court advised appellant that it would consider whether substantial evidence supported the conclusion that "the defendant attempted to apprehend a fleeing felon" and therefore whether it had a sua sponte duty to instruct the jury with CALCRIM No. 508.  The court provided appellant with an appellate opinion to read and told him he would have the opportunity to "make any arguments that he would like to make regarding CAL CRIM 508, justifiable homicide, pursuant to citizen's arrest vs. CAL CRIM 505, justifiable homicide, self-defense, or defense of another."

During the subsequent discussion, the prosecutor argued that "the problem" with giving CALCRIM No. 508 was a lack of "evidence that the victim in this case actually committed a felony."  Appellant countered that CALCRIM No. 508 "coincides with exactly what the evidence is reflecting.  It's not conflicting testimony or inconsistent statements.  You see the defendant talking to the rape victim and the rape assailant at the same time," and "then attempt to apprehend the rape suspect."  The court and prosecutor suggested that CALCRIM No. 505, Justifiable Homicide: Self-Defense or Defense of Another might be more appropriate.  The court further stated that it would do more research before deciding which instruction(s) to give.

When the court revisited the issue with the parties, it concluded that "there's not any substantial evidence that the

29

defendant attempted to apprehend a fleeing felon." It explained, "The only evidence of a quote end quote [*sic*] citizen's arrest is put forth by the defendant during his testimony. There's no evidence presented at the time of the arrest that he made such statements. There's no evidence presented on the date of the attack or the incident that there was any such conduct ongoing. As a matter of fact, as the state of the evidence is at this time is [*sic*] that Mr. Williams left the scene, did not go back to the scene, did not make any attempts to contact law enforcement between May 18, 2022 and July 7, 2022, when he was arrested on that date. So there is no evidence of a citizen's arrest. CAL CRIM 508 will not be given." The court stated that it would give CALCRIM No. 505, "based on the testimony and evidence presented in the matter and based on the defendant's request for a self-defense instruction" and appellant's position "that his actions were justified as self-defense or defense of another."

Appellant objected. The court overruled the objection but told him that he was not precluded "from making that argument, which you've already done in your testimony." Appellant argued both citizen's arrest and self-defense theories during closing.

The court instructed the jury on self-defense, mutual combat, provocation, necessity, and voluntary manslaughter based on imperfect self-defense. The court also instructed the jury that "The right to use force in self-defense or defense of another continues only as long as the danger exists or reasonably appears to exist. When the attacker withdraws or no longer appears capable of inflicting any injury, then the right to use force ends."

30

### C.    Analysis

A defendant has a right to jury instructions "'on any affirmative defense for which the record contains substantial evidence.'" (*People v. Mentch* (2008) 45 Cal.4th 274, 288.) "'In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether "there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt."'" (*Ibid.*) "On appeal, we likewise ask only whether the requested instruction was supported by substantial evidence." (*Ibid.*)  We review a trial court's failure to instruct on a defense theory de novo, viewing the evidence in the light most favorable to the defendant.  (*People v. Ibarra* (2024) 106 Cal.App.5th 1070, 1081.)

Appellant argues that substantial evidence supported the instruction.  He points to Rogers's testimony that Rogers told the police Lopez had raped someone, his own testimony, and the surveillance videos, which he contends showed that he "was taking his time to confirm that the rape actually occurred before going after Lopez to conduct a citizen's arrest."  Appellant asserts that "it would be illogical for the court to find substantial evidence to support all the other defenses that stemmed from the citizen's arrest, and yet, found no substantial evidence to support the main defense theory."

"A citizen may arrest another if a felony has in fact been committed and he has reasonable cause to believe that the person to be arrested committed it." (*People v. Fosselman* (1983) 33 Cal.3d 572, 579.)  "[T]here must be established the fact that a felony has in fact been committed.  If there was no right to arrest existent in the instant case, there can be no justification for

31

defendant to have used the force involving a deadly weapon." (*People v.* (1974) 41 Cal.App.3d 324, 328.) "'[T]he requirement that there in fact be a felony committed can only be met if there is evidence of the corpus delicti and it is an offense known by the arresting party to have been committed.'" (*Ibid.*)

As the prosecutor pointed out below and argues now, there was no substantial evidence that Lopez in fact committed a felony. The surveillance video did not show the alleged rape, and neither side introduced evidence suggesting that Lopez perpetrated a rape. Appellant's testimony that a person in a tent that he had never met before and did not even fully see told him about a rape does not establish that a crime occurred or that Lopez committed it.

Even if it did, there is also no substantial evidence supporting the fifth element of the instruction, that the killing was necessary to prevent Lopez's escape. All the testimony, including appellant's, indicated that Lopez fell to the ground after a few strikes of the stick. Appellant nevertheless continued to strike Lopez and made no effort to contact police to complete the putative arrest or report the alleged rape. Indeed, he acknowledges in his briefing that it "was highly likely that the jury found . . . that Mr. Williams used more force than reasonably necessary when he acted in self-defense." For all these reasons, we conclude the court did not err in refusing the instruction.

## III. Cumulative Error

Appellant argues that the cumulative effect of the errors in this case "significantly undermines the confidence in the outcome of the trial and requires reversal." Having concluded that appellant's contentions challenging his convictions are without merit, however, we necessarily reject this claim of resultant

32

cumulative error.  There was no prejudicial error to accumulate. (*People v. Hensley* (2014) 59 Cal.4th 788, 818.)

## IV. Presentence Custody Credits

Appellant contends, and respondent agrees that he should have received 365 days of presentence custody credit rather than 364.  We agree.

"'A defendant is entitled to actual custody credit for "all days in custody" in county jail and residential treatment facilities, including partial days.'" (*People v. Valdes* (2020) 53 Cal.App.5th 953, 955.)  "'Calculation of custody credit begins on the day of arrest and continues through the day of sentencing.'" (*Ibid.*)  "The day the defendant is arrested counts as a custody day no matter how many hours or minutes the defendant was in jail on that day"; any fraction of a day is treated as a full day for counting purposes.  (*Ibid.*)

Appellant was arrested on July 7, 2022 and sentenced on July 6, 2023.  He therefore was entitled to receive 365 days of credit, not 364.  We order the judgment modified to correct this calculation error.

## DISPOSITION

The judgment is modified to reflect 365 days of presentence custody credit. The clerk of the superior court is instructed to prepare an amended abstract of judgment including this modification and serve a copy on the Department of Corrections and Rehabilitation. The judgment is affirmed in all other respects.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


ZUKIN, P. J.


TAMZARIAN, J.